SITKIN SMELTING & REFINING CO., INC. and Monongahela Iron & Metal Co., Inc., Appellants in No. 77–1003,

v.

FMC CORPORATION.

SITKIN SMELTING & REFINING CO., INC. and Monongahela Iron & Metal Co., Inc.,

v.

FMC CORPORATION, Appellant in No. 77–1004.

Nos. 77–1003 and 77–1004.

United States Court of Appeals, Third Circuit.

Argued Sept. 8, 1977.

Decided April 13, 1978.

Theodore R. Mann, Barry E. Ungar, Larry H. Spector, Mann and Ungar, P. A., Philadelphia, Pa., for appellants in No. 77–1003; Louis B. Schwartz, Philadelphia, Pa., of counsel.

Matthew J. Broderick, Stephen A. Stack, Jr., Mari M. Gursky, Dechert, Price & Rhoads, Philadelphia, Pa., for FMC Corp., appellant in No. 77–1004.

Before SEITZ, Chief Judge, and GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Plaintiffs Sitkin Smelting & Refining Co., Inc. and Monongahela Iron & Metal Co., Inc. ("plaintiffs"), sued FMC Corporation ("defendant") in the district court. In Count 1, plaintiffs' diversity claim alleged that by awarding to Joseph Krentzman and Sons ("Krentzman") a contract to dismantle defendant's Lewistown rayon facility after allowing Krentzman to see plaintiffs' bid, FMC breached contractual obligations it owed plaintiffs. In Count 2, plaintiffs alleged a violation of Section 1 of the Sherman Act in that defendant conspired with Krentzman, who was not named as a defendant, to commit two per se violations of the antitrust laws: an illegal boycott and price fixing.

The court submitted Counts 1 and 2 to the jury on special interrogatories. The jury's answers favored plaintiffs. The court then entered judgment against defendant on both counts. Defendant filed motions for judgment notwithstanding the verdict with respect to both the contract and antitrust claims and also filed a motion for a new trial. The district court denied the motion for judgment n. o. v. and denied the motion for a new trial on Count 1, the contract claim. It granted defendant's motion for judgment n. o. v. and entered judgment in its favor on Count 2, the Sherman Act claim.

Defendant appealed from the judgment of $700,000 entered for plaintiffs on the contract claim and from the denial of the motion for a new trial. Plaintiffs appealed from the entry of judgment in favor of defendant on the antitrust claim.

We turn to the factual setting out of which the dispute arose. In view of the jury's answer to the interrogatories, we set forth the facts in a light most favorable to plaintiffs.

Defendant owned a large manufacturing facility in Lewistown, Pennsylvania. In the summer of 1972, the facility was damaged extensively by a hurricane. Thereafter, defendant decided to close the plant and to sell or otherwise dispose of it. In addition to the land and the buildings, the assets included salvageable scrap metal, machinery, equipment, and inventory. Defendant's agent solicited Sitkin to submit a bid for the plant and its contents. Plaintiffs submitted such a bid which, by its terms, was to expire October 20, 1972. Krentzman was the only other bidder.

After the two bids were received, defendant altered its plans and did not accept either bid. It decided to donate the land and buildings at the plant site to a public authority. In the words of plaintiffs' counsel, defendant then "started all over again." Thus, in July, 1973, defendant prepared elaborate bidding documents with respect to the sale of the scrap. Those documents contained various options including possible participation by defendant in the proceeds of the sale of the property. Invitations to bid were sent to approximately 50 prospective bidders throughout the United States. The invitations explicitly reserved the right to reject any and all bids. They also stated: "No revision of bids will be accepted after the bid has been submitted; your best bid must be submitted first." Bids were to be submitted by October 22, 1973.

Sitkin submitted a bid jointly with its co-plaintiff. Krentzman also submitted a bid, as did many other invitees.

After the October 22 deadline, individual clarification meetings were held with certain of the bidders, including plaintiffs and Krentzman. Subsequent to one of these clarification meetings between defendant's agents and Krentzman, Krentzman submitted a bid higher than plaintiffs, and

Krentzman's bid was eventually accepted. This lawsuit followed.

## I. THE CONTRACT CLAIM

Plaintiffs contend that among the original bids submitted in 1973, theirs was the highest. They argue that in awarding the scrap contract to Krentzman after Krentzman had seen plaintiffs' bid and then revised its own, the defendant breached its commitment made in 1972 to plaintiffs and carried forward to 1973, that if plaintiffs bid, defendant would not disclose their bid or use it to negotiate a higher bid, and would award the bid to plaintiffs if plaintiffs were the high bidder. We turn to the details of the evidence.

In 1972, prior to the submission of plaintiffs' first bid, Charles Kline, an employee of defendant, held a conversation with Lewis Sitkin, president of one of the plaintiffs, Sitkin, concerning a possible bid by Sitkin to purchase the Lewistown assets. Because Sitkin had not succeeded in doing business with defendant in the past, it sought assurances of good faith treatment by defendant should it bid for such assets. Sitkin was assured that if it submitted a bid to purchase defendant's Lewistown facility, defendant would not disclose that bid to any other bidder, would not use the bid to negotiate higher bids from other bidders, and would, if it accepted a bid, accept the "high" bid.

Plaintiffs do not contend that there was any breach of these assurances insofar as the 1972 bidding was concerned. What they do contend is that the 1972 assurances carried over to the 1973 bidding, and that those assurances were violated when defendants disclosed plaintiffs' bid to Krentzman, thereafter permitted Krentzman to submit a higher bid, and then accepted Krentzman's altered bid. Accordingly, at the trial below plaintiffs sought damages for breach of contract arising from the defendant's failure to award the contract to them on the theory that, since the 1972 high bid assurance carried over to 1973, and since plaintiffs submitted the original high bid in

1973, defendant was contractually obligated to accept it.[1]

The defendant contends, *inter alia*, that there was insufficient evidence as a matter of law to submit to the jury the issue as to whether the 1972 high bid assurance carried over to 1973.

We think the evidence warranted the jury in finding that the assurances alleged by plaintiffs were given in connection with the 1972 solicitation of bids. It is important to analyze the legal consequences of the high bid assurance, however, because it is basic to plaintiffs' breach of contract claim arising out of defendant's failure to award the contract to plaintiffs in 1973.

In plaintiffs' view the 1972 agreement to award the contract to only the high bidder endured as long as the parties intended it to endure. Plaintiffs argue that was until a contract for the disposal of the machinery and equipment was awarded in a bidding procedure. They say that there was sufficient evidence to require the submission of that issue to the jury.

It is not clear to us whether plaintiffs characterize the 1972 high bid agreement as a bilateral contract or a unilateral contract, or whether they rely on an estoppel theory of induced reliance. But no matter how classified, the same issue is presented as to whether the 1972 agreement embraced the 1973 bidding, at least as to the high bid assurance. We proceed to consider seriatim the evidence which plaintiffs contend created a jury issue as to the 1973 bidding.

The plaintiffs emphasize that the only two bidders in 1972 were metal dealers, not real estate brokers. They say this shows that defendant knew that the real value of the assets was in the metals which alone were the subject of the 1973 bidding. This appears to be the only 1972 evidence offered by plaintiffs in support of their contention that the parties intended this high bid agreement to be effective until the metal was sold. Such evidence is neutral at best as to the parties' intent with respect to the duration of the oral assurance to award the contract to the original high bidder.

Plaintiffs next point to several pieces of evidence consisting of events occurring in 1973 which, they contend, justified the submission of the intention issue to the jury:

1. In 1973, after defendant had decided to donate the real estate to the community, Kline informed another employee of defendant, one Bisio, of the high bid assurance Kline had given Sitkin in 1972.

2. When Kline met with Sitkin numerous times in 1973 concerning the sale of the scrap, Kline never informed Sitkin that the 1972 high bid assurance was inoperative.

3. Communications to Sitkin concerning bidding in 1973 came from Kline or through his direction.

4. Both the July, 1973, communication and the September, 1973, invitation to bid confirmed the 1972 high bid assurance. Plaintiffs so conclude because the communication stated "not subject to escalation," and because the invitation stated that "no revision of bids will be accepted . . . ; your best price must be submitted first."

5. The secretiveness of defendant in its dealings with Krentzman in 1973 exhibited an awareness of a mutual intent in 1972 that the 1972 high bid commitment extend to any awarding of the contract, and thus to the 1973 bidding.

6. The manner in which defendant actually tried to lower plaintiffs' bid evidence its recognition that if plaintiffs were the highest bidder an obligation existed in 1973 to award the contract to them under the terms of the 1972 oral assurances.

7. Kline acknowledged plaintiffs' duration claim when he visited Sitkin in 1973 after the contract had been awarded to Krentzman by advising Sitkin that he felt a "responsibility" to see that Sitkin was given a "fair shake all the way down the line."·

---

1. Plaintiffs do not seek recovery for the costs of preparing the bids. Indeed, plaintiffs' counsel conceded at the close of the evidence that they had not introduced any evidence of any damages based solely on the possible breach of the 1972 assurances other than the 1972 high bid assurance.

■ With the possible exception of number 1, all the 1973 "evidence" relied upon by plaintiffs, much of which is argument, is neutral at best. It lacked the definiteness that would permit a reasonable inference, as opposed to a guess, that it reflected an intention with respect to the extent of the 1972 high bid assurance. This is particularly true when we recall that the burden rested on plaintiffs. We note in this regard that though plaintiffs argue that the 1972 high bid assurance had been given to Sitkin as the president of one of the plaintiff companies, Sitkin himself never testified that he believed that the 1972 high bid assurance carried over to the 1973 bidding.

■ As to number 1, the 1973 conversation when Kline informed Bisio of the 1972 assurances, the fact of such a conversation does not tend to prove that the parties had an intent in 1972 that the high bid assurance would continue beyond the particular bid which followed the 1972 assurances. Of more importance, plaintiffs' own bid terminated by its terms on October 20, 1972. To this may be added the evidence that the 1972 bids were limited as to participants and differed substantially as to subject matter from the 1973 bid.

■ Finally, plaintiffs claim they were entitled to receive the contract in 1973 because under the continued 1972 high bid assurance they were the high bidder. Yet the evidence shows that the elaborate document soliciting the 1973 bids explicitly provided that the defendant reserved the right to reject any or all bids. This provision is flatly inconsistent with the 1972 assurance that if plaintiffs submitted the high bid it would be accepted. Thus, the very documentation which prompted plaintiffs' 1973 bid is inconsistent with an intent that the 1972 high bid assurance would apply until the scrap was sold.

We therefore conclude that whether plaintiff's evidence is viewed singly or cumulatively, it was insufficient as a matter of law to create a jury issue as to whether the 1972 high bid assurance was intended to apply to the 1973 bidding. Plaintiffs therefore were not entitled to recover on their contract claim.

## II. THE SHERMAN ACT CLAIM

Plaintiffs urge this court to reinstate the antitrust award on the theory that the defendant conspired with Krentzman to engage in "sham bidding," which they claim constitutes a per se violation of § 1 of the Sherman Act.

Although it is not clear from their briefs, we assume plaintiffs are arguing, alternatively, that the agreement violated § 1 of the Sherman Act under the "rule of reason" standard. The district judge granted defendant's motion for judgment n. o. v. on the antitrust claim, believing that the complained of practices, though "reprehensible and deceitful," did not violate § 1 of the Sherman Act. Defendant urges affirmance of the district court's disposition of this claim.

Section 1 of the Sherman Act declares illegal "[e]very contract, combination . . or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1 (1970). We must, in the first instance, determine whether the jury was justified in finding that a contract, combination or conspiracy existed between defendant and Krentzman, and, if so, whether it was "in restraint of trade." Defendant denies that any conspiracy existed between it and Krentzman. The jury found otherwise.

We believe the jury was entitled under the evidence to conclude that defendant secretly agreed with Krentzman in advance of the 1973 bidding to give Krentzman the opportunity to match the highest bid received in the bidding process and, if Krentzman matched such bid, to award Krentzman the contract. While such an agreement can be said to have made a sham of the bidding, it is clear that we are not talking about sham bidding in the common parlance, where a bidder drives up the sale price without any intention of buying. We understand plaintiffs to be referring to sham bidding in the sense that one bidder was preordained to obtain the contract if that bidder would match the high bid sub-

mitted. Having established the fact of an agreement, we proceed to consider whether said agreement was "in restraint of trade."

On its face § 1 of the Sherman Act prohibits every contract, combination, or conspiracy in restraint of trade. Since every agreement concerning trade restrains trade in some sense, the courts have construed § 1 as precluding only those contracts or combinations which *unreasonably* restrain competition. *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

As the Supreme Court has recently pointed out in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the prevailing standard of analysis under the Sherman Act is the rule of reason. The rule of reason requires the fact-finder to weigh all circumstances of the case in deciding whether a practice should be condemned because it unreasonably restrains trade. Certain relationships, however, are considered to be in violation of the Sherman Act without regard to any consideration of their reasonableness.

The per se category of antitrust violations is made up of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Courts must appraise the market impact of practices challenged on the grounds they are violative of the Sherman Act unless there is a per se violation. Since a per se violation is conclusively presumed to be unreasonable, no trial is necessary to show the nature, extent, and degree of the market effect of the practice. *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

While plaintiffs contend that the agreement was per se violative of § 1, it is difficult to isolate any specific factors relied upon by them which would allow us to support their contention. They argue that the agreement amounted to price-fixing, a practice widely acknowledged to be a per se violation of the Sherman Act. The price-fixing within the scope of the per se prohibition of § 1, however, is an agreement to fix the price to be charged in transactions with third parties, not between the contracting parties themselves. Thus, in *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), a case involving horizontal price-fixing upon which plaintiffs place some reliance, the purpose of the concerted refusal to deal was to eliminate discounters and thus raise the price of Chevrolets in transactions with consumers, who were third parties, not in transactions between the co-conspirators themselves. In vertical price-fixing cases, the prices fixed are resale prices charged to third parties and not the price between the conspiring parties themselves. See *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Pitchford v. Pepi, Inc.*, 531 F.2d 92 (3d Cir. 1975), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976). Thus, the factual foundation for plaintiffs' per se price fixing violation is absent here.

Plaintiffs also assert that the sham bidding conspiracy constituted a concerted refusal to deal, and constituted a per se violation as a group boycott. Accordingly, we have reviewed the significant cases in which the Supreme Court has examined the group boycott and concerted refusal to deal concepts. The controlling cases involve broad combinations and rather pervasive refusals to deal by a group of suppliers covering many transactions over an extended period of time. *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild of America, Inc. v. F.T.C.*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). We are not confronted with such a factual situation here.

Plaintiffs have not brought to our attention any case where a court has found a per se violation of the Sherman Act on the basis of a concerted refusal to deal between a single seller and a single buyer. We are reminded of this Court's admonition in *De-Filippo v. Ford Motor Co.*, 516 F.2d 1313 (3d Cir.), *cert. denied*, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975), that " '[t]he term "group boycott" . . . is in reality a very broad label for divergent types of concerted activity. To outlaw certain types of business conduct merely by attaching the "group boycott" and "per se" labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed.' " *Id.* at 1317–18, *quoting Worthen Bank & Trust Co. v. National Bank Americard, Inc.*, 485 F.2d 119, 125 (8th Cir. 1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974).

The mere existence of sham bidding, as that term is used by plaintiffs, in our view does not create a presumptive violation of the Sherman Act. We do not find it so anticompetitive that the court routinely should allow a party to invoke the per se rule and thereby avoid the need to show its affect on commerce in each case. As the Supreme Court has said: "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Associates*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1971). The so-called sham bidding arrangement here does not fulfill the gloss placed on the statute by the Supreme Court.

Turning to the rule of reason standard, we similarly are unable to conclude that plaintiffs have shown a violation. The standard of reasonableness is "the measure used for the purpose of determining whether, in a given case, a particular act had or had not brought about the wrong against which the statute provided." *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). The basic principle of the rule of reason, well articulated in *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), is that contractual restraints fall within the prohibition of § 1 only when their purpose and effect is found to have imposed an undue restraint on commerce.

Regarding the purpose for the agreement, it was suggested in the argument on this appeal that the purpose of the "scheme" was to arrive at a purchase price not able to be agreed upon otherwise. This seems to us to be the most logical of the purposes which might be suggested. The parties seemingly desired to find the market price, rather than influence the market price. Likewise, there was no evidence of an intent to affect quantity or quality of any goods or services. With regard to the effect of the combination, no evidence is presented by plaintiffs which suggests that prices, quantity, or quality in the scrap metal market were influenced by the combination. Nothing in the record indicates any material diminution in the existing competition for scrap.

All but one of the bidders were destined to come up "empty-handed" with or without the sham bidding. The agreement gave a preference to Krentzman. A manufacturer or trader, however, is free to choose the customers to whom it wishes to sell so long as its conduct has no market control or monopolistic purpose or effect. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Reed Brothers, Inc. v. Monsanto Company*, 525 F.2d 486 (8th Cir. 1975), *cert. denied*, 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976).

Defendant's right to exercise this free choice is not limited because of the "sham" and the "sham" does not render the exercise of the choice a violation of the Sherman Act. Conduct not within the scope of the Act is not made into an antitrust violation by accompanying conduct which is reprehensible under some moral or ethical standard or even illegal under some other law.

[T]he use of conventional antitrust language . . . will not extend the reach of the Sherman Act to wrongs not germane to that act . . . . The antitrust laws were never meant to be a panacea for all wrongs.

*Parmelee Transp. Co. v. Keeshin,* 292 F.2d 794, 804 (7th Cir.), *cert. denied,* 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961).

■■■■ In applying the rule of reason standard, courts are called upon to judge shades and gradations of competitive impact. The standard for determining what combinations involve the prohibited degree of harm is nowhere spelled out in specific terms. It is clear, however, that plaintiffs have a burden to show more than a de minimus restraint. As Justice Frankfurter pointed out in his concurring opinion in *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945):

[E]ver since the Sherman Law was saved from stifling literalness by 'the rule of reason' it is not sufficient to find a restraint. The decisive question is whether it is an unreasonable restraint.

*Id.* at 27, 65 S.Ct. at 1428 (Frankfurter, J., concurring) (citations omitted). The Sherman Act "was designed to prevent restraints of trade which [have] a significant effect on . . . competition." *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 493 n.15, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940). Plaintiffs have not met their burden to show how competition was restrained significantly. They have made conclusive statements regarding the harmful effects of the questioned combination, but have provided us with no analysis with which to conclude that defendant has been a party to an unreasonable restraint. In reviewing their claim, we consider the facts rather than "incendiary, yet vague charges" characterizing those facts. *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 834, 70 S.Ct. 894, 94 L.Ed. 1312 (1950).

■■■■ Plaintiffs have not maintained their burden to show that the combination in any substantial way either did or could affect interstate commerce by controlling market prices, imposing undue limitations on competitive conditions, or unreasonably restricting competitive opportunity. These are the kinds of practices the Sherman Act was enacted to prohibit. *Apex Hosiery Co., supra,* 310 U.S. at 493, 60 S.Ct. 982. Applying the rule of reason, we cannot conclude that the practices objected to in the instant case tend to, or actually do, restrain trade so as to violate the Sherman Act.

■■■■ Plaintiffs' briefs devote much attention to various evils resulting from the scheme promulgated by defendant. We think that application of the Sherman Act to the present facts would be contrary to the rule of reason standard. As one court declared, "the Sherman Act is neither a lowest-responsible-bidder statute nor a panacea for all business affronts which seem to fit nowhere else." *Scranton Construction Co. v. Litton Industries Leasing Corp.,* 494 F.2d 778, 783 (5th Cir. 1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975). The Sherman Act plays a vital, central role in our economic system. It has been described as the "Magna Carta of free enterprise . . . as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Associates, Inc., supra,* 405 U.S. at 610, 92 S.Ct. at 1135. But just as the Bill of Rights cannot be invoked to protect individual citizens from all forms of personal affront, the Sherman Act cannot proscribe all unseemly business practices. The manipulation of the bids of businessmen, as evidenced in the case at bar, was clearly reprehensible. Nonetheless, the Sherman Act may not be extended beyond its intended scope and used to police the morals of the marketplace.

In view of our determinations, we need not address defendant's request for a new trial.

The judgment of the district court on the contract claim will be reversed.

The judgment of the district court on the Sherman Act claim will be affirmed.

GIBBONS, Circuit Judge, dissenting.

Because my brothers in the majority have, with respect to the contract claim, usurped the proper function of the jury and, with respect to the antitrust claim, misstated the governing law, I respectfully dissent.

## I. THE CONTRACT CLAIM

The theory of plaintiff, Sitkin Smelting and Refining Co., Inc., carefully set out in Judge VanArtsdalen's charge to the jury, was that Charles Kline, acting for FMC Corporation promised in 1972 that, if Sitkin would bid on the FMC plant, FMC (1) would not use Sitkin's bid to negotiate higher bids from other bidders and (2) would, if it accepted any bid, accept the highest bid. The court expressly charged:

> It is only in the event that you find that FMC made the definite promise to Sitkin in respect to the 1972 bidding for the purchase of the entire plant, which promises remained in effect by agreement and assent of the parties in respect to the bidding that took place in 1973. And it could only be on that basis that the plaintiffs could establish any contract between FMC and plaintiffs in regard to the facts of this case.

App. 618. This charge—that in order for Sitkin to recover, the jury must find that the 1972 promises remained in effect in 1973—was repeated several times. Judge VanArtsdalen reviewed the evidence for the jury and pointed out that the testimony on the intention of the parties was conflicting. Given the conflict, he denied FMC's motion for a directed verdict, pursuant to Fed.R.Civ.P. 50(a), and left the issue to the jury on special interrogatories. Before it could return a verdict for Sitkin on the contract claim, it had to—and did—answer the following questions in the affirmative:

> 1. Did FMC Corporation and Sitkin Smelting & Refining Co., Inc., through authorized agents, enter into a contract in 1972 wherein they mutually agreed that if Sitkin Smelting & Refining Co., Inc. made a bid to purchase FMC Corporation's Lewistown plant in its entirety, including real estate, FMC Corporation

> (a) would not disclose such bid to any other bidder?
>
> Yes
>
> (b) would not use such bid to negotiate higher bids from other bidders?
>
> Yes
>
> (c) would, if it accepted any bid, accept the highest and best bid?
>
> Yes
>
> 2. If any part of No. 1((a), (b) or (c)), is answered Yes, did the same terms and conditions as found to exist in the Answer to Interrogatory No. 1 above apply to the bid submitted by Sitkin Smelting & Refining Co., Inc., on behalf of itself and jointly with Monongahela Iron and Metal Co., Inc., in 1973 for the dismantling of FMC Corporation's Lewistown plant, in response to the invitations to bid in accordance with specifications prepared by FMC Corporation?
>
> Yes

When, after the verdict, FMC moved for judgment notwithstanding the verdict, pursuant to Fed.R.Civ.P. 50(b), Judge VanArtsdalen denied the motion, saying "[a] careful review of the record . . . convinces me that . . . there was more than sufficient credible evidence upon which the jury could properly base its findings contained in the answers to written interrogatories . . . ." App. 735.

The majority concedes that there is ample evidence to support the jury's answer to Interrogatory No. 1. Thus we, as a reviewing court, are bound to accept the fact that FMC made the three promises listed in that question. A contract came into being in 1972. Interrogatory No. 2 is concerned, not with its existence, but with its duration and terms. Both depended on the intention of the parties. The majority says that the evidence on duration "lacked the definiteness that would permit a reasonable inference, as opposed to a guess, that it reflected an intention with respect to the extent of the 1972 high bid assurance." *Supra*, p. 445. The difficulty with this position is that a contract of *some* duration is acknowledged to have come into existence. It is no

less speculative to accept FMC's version than Sitkin's.

The testimony of the two men who negotiated the contract, Lewis Sitkin (for Sitkin) and Charles Kline (for FMC), reveals no express reference to duration. Intention concerning duration must have been determined from the surrounding circumstances. The majority holds as a matter of law that no fact finder could find that the promises listed in Interrogatory No. 1 survived FMC's rejection of the 1972 bids. Plainly that is not so. If, for example, immediately following the rejection of the 1972 bids FMC had taken Sitkin's bid to a third party and used it to fix the price for a negotiated sale of the plant, such disclosure would have been a breach of contract. This result is unaffected by the fact, relied on by the majority, that Sitkin's 1972 bid expired on October 20, 1972. The parties to the contract certainly did not contemplate that on October 21, 1972, FMC could disclose Sitkin's bid to a third party and negotiate a private sale. Having found the 1972 contract, a fact finder could—indeed must—conclude that some of its covenants extended beyond October, 1972.

Which covenants extended beyond that date? Clearly not the undertaking to accept the highest bid, says the majority, because the 1973 solicitation explicitly reserved the right to reject all bids. The short answer to that argument is: so did the 1972 solicitation. The covenant on which Sitkin relies bound FMC to accept the highest bid *if it accepted any bid*. The majority's observation that "the very documentation which prompted plaintiffs' 1973 bid is inconsistent with an intent that the 1972 high bid assurance would apply until the scrap was sold," *supra*, p. 445, is tortured reasoning in light of the actual covenant. Had no sale taken place, Sitkin would have had no claim. But a bid was accepted, and if, as the jury held, the covenant to accept the highest bid was still binding, then Sitkin did have a claim.

There is evidence that Kline informed Attilio Bisio, who was hired by FMC in March, 1973, and assigned the job of disposing of the plant, about the 1972 agreement with Sitkin. Specifically, Kline told Bisio that he had promised Sitkin that the latter's bid would not be disclosed and that, if any bid was accepted, it would be the highest bid. Kline told Bisio, in other words, the contract terms which the jury found in Interrogatory No. 1. A reasonable man could conclude that Kline was not engaging in idle conversation but was briefing the man now in charge of disposing of the plant on the contractual limitations within which he had to operate. Had Kline understood in 1973 that the 1972 undertakings were no longer binding, he would have had little or no reason to brief Bisio on them—at least a reasonable man could so conclude.

There is also evidence that after the 1973 bidding Kline acknowledged a special responsibility to Sitkin—"a responsibility to be sure that he had been given an absolutely, completely fair shake all the way down the line," App. 434. This special responsibility toward Sitkin (unlike other bidders) is evidenced by the special treatment accorded Sitkin's 1973 bid and by the personal visit paid to Lewis Sitkin to inform him that his bid had been rejected.

In addition to the evidence of FMC dealings with Sitkin is the evidence of its secret 1973 contracts with Krentzman, the favored bidder. What need for secrecy if FMC had no contractual obligation to Sitkin? A reasonable man could conclude that it evidenced the continuing effect of the 1972 undertakings. A reasonable jury did so conclude. The majority rejects all this 1973 evidence as not tending to prove the intent of the parties in 1972. By so doing, it substitutes its own evaluation of the evidence for that of the jury. Like the trial judge who heard the testimony and observed the demeanor of Kline, Bisio, and Sitkin, I conclude that the jury was properly asked Interrogatory No. 2 and that its verdict should not be disturbed.

## II.  THE ANTITRUST CLAIM

A complaint alleging a conspiracy to deprive a competitor of the benefits of a lawful contract in or affecting interstate

commerce by unlawful means states a valid antitrust claim. As summarized by the majority in this case, Sitkin's complaint charged a conspiracy "to commit two per se violations of the antitrust laws: an illegal boycott and price fixing." *Supra* p. 442. In the first place, this is not a fair characterization of Count II of plaintiffs' complaint. In fact, that count charges:

## COUNT II

17. The foregoing constitutes a contract, combination and conspiracy in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *App. 9.* The "foregoing" to which it refers is the factual recitation that FMC and Krentzman secretly and fraudulently conspired with each other to obtain and use Sitkin's bid and to deprive Sitkin of the benefits of the contract which resulted when it submitted the high bid. From the jury's findings, it is clear that there was just such a conspiracy.

It is true that at trial Sitkin analogized what had transpired to group boycott and price fixing, but its pleadings did not commit it to any precise category of per se violation. The point it made was that the conspiracy, which everyone agreed affected commerce, had no lawful purpose whatsoever and resulted in the destruction of genuine competition. This was not a case in which reliance on a per se rule was required because no reasonable justification could have been tendered for the immoral conduct found by the jury. None was, in fact, tendered; instead, FMC denied the existence of the conspiracy. The jury, however, found otherwise.

My difference with the majority on the antitrust claim is fundamental. The majority starts with a search for a per se category into which the conspiracy might fit; finding none, it proceeds to examine the substantiality of the effect upon competition. I start, as Judge Taft did in *United States v. Addyston Pipe & Steel Co.,* 85 F. 271 (6th Cir. 1898), *modified and aff'd,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), by searching for a lawful main purpose. If a

lawful main purpose for a combination or agreement producing a restraint can be identified, I proceed to inquire whether its effect upon competition is such that it can be called reasonable. But if, as here, no one can identify any lawful purpose for the combination or agreement and if, as here, the resulting restraint affects interstate commerce, then a search for per se categories and an inquiry into the substantiality of effect are not required. A conspiracy that would be unlawful at common law— and I have little doubt about the unlawfulness of this one—must, if it affects interstate commerce sufficiently for federal jurisdictional purposes, violate the Sherman Act.

Moreover, even if there were no such contract, as the jury found, there certainly was a solicitation of bids and a conspiracy to deprive bidders not only of the cost of preparing those bids but also of the valuable trade information contained therein. That conspiracy injured every bidder (except Krentzman) in its business or property to the extent of such cost and the value of such information. Being unable to conjure up a lawful purpose for a fake auction and recognizing that this fake auction was conducted in interstate commerce, I would find a Sherman Act violation even without the contract. Without the contract, of course, the amount of damages would be different.

The majority responds that, although manipulation of the bids of businessmen is "clearly reprehensible," the Sherman Act may not be used "to police the morals of the marketplace." *Supra,* p. 448. I had thought, until today, that policing the morals of the interstate marketplace was exactly what Senator Sherman had in mind. A conspiracy to conduct a fake auction in the auction market for securities conducted by our national securities exchanges, for example, was surely within his contemplation.

## III.  CONCLUSION

The jury found that there was a breach of contract which was the result of a conspiracy. It found damages in the amount

of $700,000. Under Section 4 of the Clayton Act the recovery is three times actual damages. I would affirm the judgment on the contract claim and reverse the judgment on the antitrust claim.