**MHB DISTRIBUTORS, INC.**

v.

**PARKER HANNIFIN CORPORATION
and RG Industries, Inc.**

**Civ. No. 90–2975.**

United States District Court,
E.D. Pennsylvania.

Sept. 4, 1992.

**1266**

Harold E. Kohn, Wayne M. Thomas, Steven A. Asher, Philadelphia, Pa., Roberta L. Binder, Blue Bell, Pa., for plaintiff.

Henry W. Rhoads, R. Stephen Shibla, Harrisburg, Pa., Howard D. Scher, Richard Scheff, Philadelphia, Pa., John F. McClatchey, Cleveland, Ohio, Charles L. Freed, Washington, D.C., for defendants.

## OPINION

LOUIS H. POLLAK, Senior District Judge.

Defendants Parker Hannifin Corporation ("Parker") and RG Industries ("RG") have moved for summary judgment on each count of plaintiff MHB Distributors' ("MHB") Amended Complaint. For the reasons that follow, defendants' motion will be granted.

### I.

When considering a summary judgment motion, the court must take as true the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). For purposes of this summary judgment motion, then, the facts of the case are as follows:

Parker is a manufacturer of hydraulic and pneumatic components and systems, and has developed a nationwide network of Parker product distributors. In 1987, MHB acquired the assets of a Parker distributorship, Pneumatics & Hydraulics, Inc.[1], and became a distributor of both Parker fluid power and fluid connector products. Upon becoming a Parker franchise, MHB signed Parker's Basic Agreement and several Distribution Agreements establishing the terms of the business relationship.

Two aspects of the contracts are particularly relevant in this case. First, the Basic Agreement prohibited MHB from assigning or transferring in whole or part its Parker distribution rights without Parker's prior consent. MHB could not change ownership absent prior written consent of Parker.

Second, the Distribution Agreements defined the area of MHB's primary responsibility. MHB's area of primary responsibility for the sale of fluid power products was Southeastern Pennsylvania.[2] For other Parker products MHB served as the distributor for Southeastern Pennsylvania, Southern New Jersey, Northern Maryland and Northern Delaware.

At first, MHB experienced a certain amount of success as a distributor of Parker products. Amended Complaint at ¶ 17.

---

1. For purposes of simplicity, Pneumatics & Hydraulics, Inc. will be referred to by the name of its owner, MHB.

2. Parker notes that while MHB contracted to distribute both fluid power and fluid connector products, Parker's FluidPower Group had the primary role both in approving MHB as a distributor and in deciding whether Parker would assign MHB's distribution rights. Motion for Summary Judgment at 3 n. 1.

MHB alleges, though, that Parker began to impose restrictions on MHB's business activity that substantially hurt MHB's profitability. Namely, in the spring of 1988, Parker required MHB to discontinue its distribution of non-Parker lines of hydraulic and pneumatic equipment. MHB claims that the restrictions on its distribution capacity created a severe cash flow problem for the company.

In October 1989, Parker put MHB on "credit hold," and refused to ship any more Parker products to MHB. MHB contends that Parker's conduct was unwarranted and that the effect of the "credit hold" was, ultimately, to put MHB out of business. Amended Complaint at ¶ 25.

To escape the growing financial bind, MHB wanted to sell its business. Parker suggested that MHB meet with RG—a Parker distributor based in York, Pennsylvania—as RG might be interested in buying the company. While MHB did meet with RG, RG refused to submit what MHB believed to be a competitive bid for the company. *See* Bradshaw Deposition, Ex. 2, Plaintiff's Brief in Opp. at 383–386.

Independently, MHB found other interested buyers willing to negotiate for the purchase of MHB, but only on the condition that Parker give its preliminary consent to the assignment of MHB's distribution rights. Parker declined to give its preliminary consent in any instance.

Thereafter, Parker allowed RG to supplant MHB as distributor by giving RG the customer orders MHB had placed with Parker and, subsequently, MHB's customer list. In February 1990, MHB received a letter from Parker saying its franchise had been terminated.

Based on the above facts, MHB raises eight claims, some against both Parker and RG, and others against them individually. MHB makes two claims against both Parker and RG: conspiracy in violation of section 1 of the Sherman Antitrust Act ("Sher-

man Act") to restrain trade in the sale of MHB's distribution business (count I); and conspiracy to interfere with MHB's business relationships (count VII). Counts II through VI name only Parker as defendant, and include: breach of duty of good faith and fair dealing in the fulfillment of the terms of the contract (count II); intentional interference with MHB's business and contractual relationships (counts III and IV); breach of contract (count V); and fraud and misrepresentation (count VI). Finally, MHB has raised one count of unjust enrichment (count VIII) against RG alone.

Defendants seek summary judgment with respect to all of the claims against them.

## II.

Under Fed.R.Civ.P. 56(c), a district court may enter summary judgment where the moving party has established that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. The burden rests with the moving party to identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This burden may be met by disclosing to the district court that after meaningful discovery the non-moving party lacks sufficient evidence to support its claim. *Id.* at 325, 106 S.Ct. at 2553.

Once the moving party has met its burden of production, the burden shifts to the non-moving party to produce affidavits, depositions, answers to interrogatories, and admissions on file, that set forth specific facts showing there exists a genuine issue for trial. *Id.; see also* Fed.R.Civ.P. 56(e).[3] The non-moving party may not rest on its allegations, but must advance probative evidence in support of its claim. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

---

**3.** Rule 56(e) reads in relevant part:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Specifically, the non-moving party must produce evidence such that a reasonable juror could find for that party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. When considering how a reasonable juror would rule, the court should apply the substantive evidentiary standard—in this instance, a preponderance of the evidence—that the fact-finder would be required to use at trial. *Id.* at 252, 106 S.Ct. at 2512. A mere scintilla of evidence will not require the court to send the question to the fact-finder. *Id.* at 251, 106 S.Ct. at 2511 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1872)).

### III.

Defendants argue that they are entitled to summary judgment on plaintiff's Sherman Act § 1 claim since MHB has failed to produce evidence sufficient to show that defendants' conduct caused injury to competition in the relevant market. For the following reasons, summary judgment will be granted in favor of defendants with respect to count I.

Generally, § 1 Sherman Act claims are reviewed as either *per se* violations of the Sherman Act or under a rule-of-reason standard. *Per se* violations of the Sherman Act include those "practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or business excuse for their use." *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Over the years, *per se* illegal practices have included group boycotts, price fixing, resale price maintenance, tying arrangements and some reciprocal dealing. *Malley–Duff & Assoc. v. Crown Life Insur. Co.*, 734 F.2d 133, 140 (3d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984).

MHB argues that the agreement between Parker and RG constitutes a *per se* violation of § 1 of the Sherman Act in that the conduct resembles bid rigging. Whereas typical bid rigging involves collusion among bidders to control the bid level, MHB appears to suggest that this case entails collusion between Parker and RG to influence the bidding on the purchase of MHB.

As opposed to most bid rigging arrangements, the agreement between Parker and RG is vertical, not horizontal.[4] Yet, courts have only deemed bid rigging a *per se* violation where the agreements have been horizontal. *See, e.g., United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1192 (3d Cir.1984) (finding bid rigging among horizontal companies *per se* illegal conduct), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985). Courts are generally less likely to find *per se* violations in the case of vertical agreements. The Supreme Court has stated: "a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." *Business Electronics v. Sharp Electronics*, 485 U.S. 717, 735–36, 108 S.Ct. 1515, 1525, 99 L.Ed.2d 808 (1988). As MHB has not alleged any agreement between RG and Parker on price levels, the so-called "bid rigging" agreement between defendants does not constitute a *per se* violation of the Sherman Act.

The appropriate standard for reviewing vertical nonprice restraints is rule of reason. This standard requires plaintiffs raising § 1 Sherman Act claims to prove four elements:

1) that the defendants contracted, combined, or conspired among each other; 2) that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets; 3) that the objects of the conduct pursuant to that contract and conspiracy were illegal; and 4) that the plaintiff was injured as a proximate result of that conspiracy.

---

**4.** The nature of the agreement is determined by the relationship of the parties making the agreement, not by the effects of the agreement. "[A] restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement." *Business Electronics v. Sharp Electronics*, 485 U.S. 717, 730 n. 4, 108 S.Ct. 1515, 1522 n. 4, 99 L.Ed.2d 808 (1988).

*Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 722 (3d Cir.1991) (citations omitted), *cert. denied,* — U.S. ——, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992). Focusing on the second element, defendants argue that plaintiff has failed to demonstrate that Parker's and RG's conduct caused injury to competition within the relevant markets.

Broken down, defendants' contention has two components. Defendants allege that plaintiff has not only failed to tender sufficient evidence specifying the relevant markets, but has also failed to prove anticompetitive effects in the very markets it has selected.

■ Defendants argue that the relevant product market is the sale of fluid power *products* and the relevant geographic market is Pennsylvania and the United States.[5]

Plaintiff, however, asserts that the relevant product market is the sale of fluid power *distributorships*, and the relevant geographic market is Southeastern Pennsylvania.[6] While plaintiff has produced meager evidence to support its construction of the relevant markets, I will, for purposes of argument, accept plaintiff's version.[7] It appears, though, upon review of MHB's evidence, that even within its own definition of the relevant markets, plaintiff has not established that defendants' conduct injured competition.

"[A] vertical restraint is not unreasonable unless it impacts on interbrand competition." *Inter–City Tire and Auto Center v. Uniroyal, Inc.,* 701 F.Supp. 1120, 1123 (D.N.J.1988) (citing *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)), *aff'd without*

---

5. Defendants cite in support of their position a Memorandum Opinion of March 4, 1991 issued by this court in response to Parker's Motion to Dismiss. There, the court stated: "plaintiff's complaint, whether required to or not, does identify the relevant market: 'the distribution of industrial hydraulic systems in the Commonwealth of Pennsylvania and throughout the United States.'" From this statement, defendants glean that the court found the concept of a market of distributorships "not economically viable." Defendants' Motion for Sum. Judg. at 9. Defendants assert that plaintiff ignores the law of the case by contending for relevant markets other than those stated by the court.

Defendants read too much into the statement. The court did not distinguish in its Memorandum Opinion between sale of fluid power products and sale of distributorships, as defendants suggest. The court merely noted that plaintiff had alleged a relevant market, thereby surviving a motion to dismiss. The March 4, 1991 Memorandum Opinion did not purport to provide an exact definition of the relevant markets.

6. Plaintiff has actually put forth several different relevant product and geographic markets throughout the course of this case. In the Amended Complaint, for example, plaintiff gives two relevant product markets: "industrial hydraulic equipment and systems," Amended Complaint at ¶ 7; and MHB's distribution business, *Id.* at ¶ 22. Now in its Brief in Opposition, plaintiff asserts the relevant product is the sale of fluid power distributorships. Because this is a motion for summary judgment against plaintiff, obligating the court to make all justifiable inferences in MHB's favor, the relevant product market asserted by plaintiff will, for purposes of this opinion, be the sale of fluid power distributorships.

7. Plaintiff has offered little evidence in support of its conception of the relevant markets. As support for its definition of the relevant product market as "fluid power distributorships," MHB notes that ten companies were interested in buying MHB. MHB also states that "there are a finite number of businesses in the Philadelphia area which see themselves, and are perceived by others, as being fluid power distributorships." Sur–Reply at 2. The Third Circuit has explained that the "relevant product market is defined as those 'commodities reasonably interchangeable by consumers for the same purposes.' ... Accordingly the products in a relevant market would be characterized by cross-elasticity of demand." *Tunis Bros. Co., Inc.,* 952 F.2d at 722 (quoting *United States v. E.I. Du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956)). MHB's evidence does not address the considerations set out in *Tunis Bros.*

Nor has MHB offered very convincing evidence in support of its construction of the relevant geographic market. "The relevant geographic market is the area in which a potential buyer may rationally look for goods or services he seeks." *Pennsylvania Dental Ass'n. v. Medical Service Ass'n. of Pa.,* 745 F.2d 248, 260 (3d Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985). In support of its assertion that Southeastern Pennsylvania constitutes the relevant geographic market, MHB mentions that Southeastern Pennsylvania is the area in which it was authorized to distribute Parker fluid power products. However, under MHB's own construct of the relevant markets, the goods of concern are not fluid power *products,* but fluid power *distributorships,* which would appear to make the area in which MHB sells fluid power products of limited relevance.

*opinion*, 888 F.2d 1380 (3d Cir.1989). As the Supreme Court recently stated in *Business Electronics*, "interbrand competition is the primary concern of the antitrust laws." 485 U.S. at 726, 108 S.Ct. at 1520.[8] According to Judge Posner, in order adversely to affect interbrand competition, a company must have "market power," where "market power" is defined as the ability of a business entity unilaterally to raise its price above the price charged by competitors.[9] Only a company with market power can adopt anticompetitive restraints and survive. A company without market power lacks the capacity to injure interbrand competition.

Not surprisingly, Judge Posner's insights have proved influential. Several courts have required that plaintiffs alleging anticompetitive effects show as a threshold matter that defendants have substantial market power in the relevant markets. *See Assam Drug Co., Inc. v. Miller Brewing Co., Inc.*, 798 F.2d 311, 316 (8th Cir.1986) (citing a number of cases which have imposed this threshold condition); *Inter–City Tire and Auto Center*, 701 F.Supp. at 1123 (using *Assam* market power analysis), *aff'd without opinion*, 888 F.2d 1380 (3d Cir. 1989); *O.S.C. Corp. v. Apple Computer, Inc.*, 601 F.Supp. 1274, 1291 n. 8 (C.D.Cal. 1985), *aff'd*, 792 F.2d 1464, 1469 (9th Cir. 1986).

Accordingly, to avoid summary judgment, MHB must, as a threshold matter, produce some evidence tending to show that Parker has market power within Southeastern Pennsylvania with respect to the sale of fluid power distributorships.

■ Market power is measured by two factors: market share and product differ-

entiation. *Package Shop, Inc. v. Anheuser–Busch, Inc.*, 675 F.Supp. 894, 940 (D.N.J.1987) (quoting ABA Antitrust Section, Monograph 2, *Vertical Restrictions Limiting Intrabrand Competition*, 62–63 (1977)). Defendants have produced an affidavit showing that there are forty fluid power distributorships in the Southeastern Pennsylvania area, two of which are indicated as selling Parker FluidPower products (Die-a-Matic and Progressive Hydraulics). Defendants' Brief in Sup. at 13–14. Although it is not clear from the affidavit, it appears that two other distributorships (MHB and Rexroth) may also sell Parker FluidPower products. Thus, Parker fluid power distributorships represent from 5% to 10% of the fluid power distributorships in the Philadelphia area.[10] Even assuming Parker's market share were 10%, the percentage is insufficient to bestow market power upon Parker. Companies with a far greater share of the market have been found to lack market power. *See Assam Drug Co., Inc.*, 798 F.2d at 318–19 (19.1% market share insufficient); *Donald B. Rice Tire Co.*, 483 F.Supp. 750 (D.Md.1980) (20%–25% insufficient), *aff'd*, 638 F.2d 15 (4th Cir.1981), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *OSC Corp. v. Apple Computer, Inc.*, 601 F.Supp. 1274 (C.D.Cal.1985) (20% insufficient), *aff'd*, 792 F.2d 1464, 1469 (9th Cir. 1986).

Market share is not the only indicator, though. Companies with small market share may have significant market power where their product is insulated from competition because of product differentiation. However, MHB has not presented evidence of product differentiation among fluid power distributors. The record offers no rea-

---

**8.** "Interbrand" competition refers to competition among manufacturers of various brands of a product. In contrast is "intrabrand" competition, which involves competition among distributors of the product of a single manufacturer. *See GTE Sylvania, Inc.*, 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19.

**9.** *See The Next Step in The Antitrust Treatment of Restricted Distribution: Per Se Legality*, 48 U.Chi.L.Rev. 6, 16 (1981). This essay was written shortly before Judge Posner's appointment to the bench.

**10.** One might reasonably wonder whether it makes economic sense to talk about market share of Southeastern Pennsylvania fluidpower distributorships in percentage terms: one distributorship may, after all, be many times as large as another. But in this case it is to be noted that Parker's 5% to 10% market share of fluid power distributorships correlates closely with its market share of fluid power product sales, which is 8%. *See* note 11, *infra.*

son why potential purchasers would consider the purchase of Parker fluid power distributorships and would disregard other competing fluid power distributorships.[11]

MHB argues that the eagerness of ten companies to purchase MHB demonstrates Parker's market power. This fact, it seems, cannot support the inference of market power. The interest of several buyers reflects instead an expectation of profit. Profit can be had from companies without market power. MHB also insists that the willingness of MHB and RG to sell Parker products exclusively shows Parker's market power. Again, plaintiff's evidence does not support an inference of market power. MHB's and RG's willingness to forgo other distributorship contracts does not indicate Parker's market power among competitors so much as Parker's power as a manufacturer over a distributor. *Cf. Arnold Pontiac–GMC, Inc. v. General Motors Corp.*, 700 F.Supp. 838 (W.D.Pa.1988) (agreement between manufacturer and distributor of an exclusive franchise is not *per se* illegal).

■■■ Plaintiff has presented inadequate evidence to show Parker's market power. However, even if MHB had demonstrated that Parker had the requisite market power, MHB has nonetheless failed to meet its evidentiary burden of proving anticompetitive effects within the relevant markets. In its opposing brief, plaintiff states: "Parker's conduct in impairing MHB's ability to sell that franchise clearly constitutes a restraint within a relevant market." Plaintiff's Brief in Opp. at 9.

Plaintiff's allegation, even if accepted as true, does not amount to anticompetitive effects within the purview of the Sherman Act. The Sherman Act protects competition, not the competitor. *See, e.g. Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Injury to a competitor, even "the total elimination of one competitor," is not sufficient to make a Sherman Act claim. *Northeast Women's Center, Inc. v. McMonagle*, 670 F.Supp. 1300, 1305 (E.D.Pa.1987). *Cf. Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1071 (3d Cir.1978) (Sherman Act not designed to provide relief for all business torts committed by or against persons engaged in interstate commerce) (citing *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 1547, 89 L.Ed. 1954 (1945)).

In *Northeast Women's Center*, the court explained how a plaintiff may show anticompetitive effects:

> An injury to competition within an industry may be proven by an appreciable reduction in the number of competitors or by some other outward sign of adverse effects on competitive conditions.

670 F.Supp. at 1304. Plaintiff has not shown an appreciable reduction in the number of competitors. Nor has plaintiff suggested that there has been an increase in the price of fluid power distributorships, a typical outward sign of adverse effects.

As its evidence of Parker's and RG's adverse effect on competition, MHB notes that, besides losing its own business, ten willing buyers suffered an injury because

---

**11.** Plaintiff's evidence does not establish that Parker has market power in any conceivable construction of the relevant product market. Defendants have proffered two alternative product markets to the sale of fluid power distributorships: the sale of fluid power products, or the sale of distributorships in general.

According to an affidavit submitted by defendants, Parker FluidPower products held approximately an 8% market share of all fluid power products sold in the Philadelphia area from July 1988 to July 1990. Defendants' Brief in Sup. at 13–14. If 10% market share does not constitute market power, 8% certainly does not.

Plaintiff does present evidence to suggest Parker FluidPower products are somehow different from the other fluid power products distributed

in the area or that there is no substitute brand for Parker FluidPower products. In fact, the record suggests Parker FluidPower products face substantial interbrand competition with a number of manufacturers producing similar products.

Were the relevant product market the sale of distributorships in general, as opposed to the sale of *fluid power* distributorships specifically, plaintiff's argument for Parker's market power would be weakest. While not known from the record, the number of general distributorships must be some number greater than forty (the number of fluid power distributorships), driving Parker's market share below 10%. Plaintiff has not presented evidence of product differentiation with respect to this product market, either.

they could not "pursue the purchase of the business." Plaintiff's Brief in Opp. at 10. Although an unreasonable restriction of competitive opportunity is a recognized anticompetitive effect, *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 447 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978), plaintiff's statement is insufficient to show an unreasonable restriction. While the ten companies willing to buy MHB could not purchase MHB, they still had the opportunity to buy any of a number of other fluid power distributorships. The lost opportunity to buy one fluid power distributorship in a market of forty does not amount to an unreasonable restriction or an anticompetitive injury to the relevant market.

### IV.

Summary judgment is not granted lightly in any case. And that caveat has special force in antitrust litigation. *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). But in a proper case—such as this one, in which plaintiff has not been able to establish that a genuine issue of fact remains to be tried—summary judgment is appropriate. As the Court put it in *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968):

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

Accordingly, an order will be filed granting defendants' Motion for Summary Judgment with respect to count I. Furthermore, because plaintiff has failed to establish a genuine issue of fact essential to this court's subject matter jurisdiction, the remainder of plaintiff's claims, all pendent state law claims, will also be dismissed. *United Mine Workers v. Gibbs*, 383 U.S.

715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).