PENNSYLVANIA DENTAL ASSOCIATION; Delaware County Dental Society; Erie County Dental Association; Harrisburg Area Dental Society; Luzerne County Dental Society; Montgomery-Bucks Dental Society; Odontological Society of Western Pennsylvania; Scranton Dental Society; and York County Dental Society, Third Party Plaintiffs,

v.

MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA, d/b/a Pennsylvania Blue Shield; and Donald S. Mayes, D.D.S., In His Individual Capacity, Third Party Defendants, Counterclaim Defendants.

Appeal of YORK COUNTY DENTAL SOCIETY, Fifth District Dental Society, Dennis W. King, D.D.S.; Charles M. Ludwig, D.D.S.; Theodore R. Paladino, D.D.S.; Thomas L. Perkins, D.M.D.; and Kay F. Thompson, D.D.S.

Pennsylvania Dental Association; Delaware Valley Dental Society; Erie County Dental Association, Inc.; Harrisburg Area Dental Society; Luzerne County Dental Society; Montgomery-Bucks Dental Society; Odontological Society of Western Pennsylvania; Scranton District Dental Society; Charles M. Ludwig, D.D.S.; Dennis W. King, D.D.S.; Theodore R. Paladino, D.D.S.; Thomas L. Perkins, D.M.D.

No. 84–5004.

United States Court of Appeals, Third Circuit.

Argued Aug. 14, 1984.

Decided Oct. 1, 1984.

Rehearing and Rehearing en Banc Denied Nov. 15, 1984.

Barry E. Carter (argued), Washington, D.C., Thomas A. Beckley, John G. Milakovic, Beckley & Madden, Harrisburg, Pa., for appellants.

Joseph Friedman (argued), Stephen F. Ban, Michael J. Hennessy, Springer & Perry, Pittsburgh, Pa., William H. Wood, William E. Miller, Jr., Thomas E. Wood, Keefer, Wood, Allen & Rahal, Harrisburg, Pa., for appellees.

Before ALDISERT, Chief Judge, WEIS, Circuit Judge, and RE, Judge.*

## OPINION OF THE COURT

ALDISERT, Chief Judge.

This appeal requires us to decide whether Blue Shield's prepaid dental service program in Pennsylvania violates the antitrust laws. Several Pennsylvania dental associations and individual dentists appeal from a summary judgment dismissing their antitrust and state law claims brought against the Medical Service Association of Pennsylvania, doing business as Pennsylvania Blue

* Honorable Edward D. Re, Chief Judge of the United States Court for International Trade, sitting by designation.

Shield.[1] Appellants argue that Blue Shield engaged in a price-fixing conspiracy and a group boycott in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, attempted to monopolize and monopolized in violation of § 2 of the Act, 15 U.S.C. § 2, and that the district court abused its discretion in refusing to certify a subclass of cooperating dentists for treble damages purposes. We conclude that appellants' contentions are without merit, and therefore affirm the judgment of the district court. 574 F.Supp. 457.

## I.

This lawsuit is a vestige of an ill-fated action brought by the Commonwealth of Pennsylvania against nine dental associations in the state charging that they ran afoul of antitrust laws and Pennsylvania law by discouraging dentists from participating in the Blue Shield program. Essentially, the complaint accused the dentists of restraining trade under § 1 of the Sherman Act. The associations, however, countered with an antitrust action of their own, filing a third-party complaint against Blue Shield charging violations of §§ 1 and 2 of the Sherman Act, alleging that the determination of fees paid dentists by Blue Shield constitutes price fixing and a boycott, and further, that with its market power and through anticompetitive acts, Blue Shield is attempting to or is monopolizing certain relevant Pennsylvania markets and submarkets. They also asserted state law claims and requested treble damages, injunctive relief and punitive damages.

After extensive discovery, the state dismissed the Commonwealth's complaint against the associations over the objections of Blue Shield, leaving only the third-party action to survive. Blue Shield then counterclaimed against the original defendants, an additional dental society and five individual dentists, asserting a violation of § 1 of Sherman and alleging a conspiracy to boycott Blue Shield's dental programs by causing their members to terminate their participating agreements with Blue Shield, to fix charges for services paid under Blue Sheild's dental program, to impede Blue Shield's cost containment efforts and to discourage dental insurance purchasers from enrollment or continued enrollment in Blue Shield's dental programs. This counterclaim also asserted causes of action under state law including tortious interference with contractual relations, civil conspiracy and trade libel. But there was more to come. Four of the five individual dentists then filed a class action in the form of a counterclaim against Blue Shield, and, like the dental associations, alleged Sherman §§ 1 and 2 violations. Remaining are the litigants presently before us. Arrayed on one side are the Pennsylvania Dental Association, Delaware County Dental Society, Erie County Dental Association, Harrisburg Area Dental Society, Luzerne County Dental Society, Montgomery-Bucks Dental Society, Odontological Society of Western Pennsylvania, Scranton Dental Society, York County Dental Society, Dennis W. King, Charles M. Ludwig, Theodore R. Paladino, and Thomas L. Perkins. On the other side are Blue Shield and Donald S. Mayes, one of its officers, being sued in his own right.[2]

We consider in this appeal, in its Rule 54(b) context, only the summary judgment entered in favor of Blue Shield in the third-party complaint and in the class action counterclaim asserted against it. Not before us, and presumably still very much

---

1. We have jurisdiction under 28 U.S.C. § 1291 because the district court entered a final judgment certified pursuant to Rule 54(b), F.R.Civ.P. That rule provides in relevant part:

 (b) **Judgment Upon Multiple Claims or Involving Multiple Parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

2. For the purpose of this opinion we will refer to both appellees as Blue Shield.

alive in the district court, is Blue Shield's counterclaim against the appellants.

## II.

The controversy concerns Blue Shield's prepaid dental service program in Pennsylvania. Under that program, Blue Shield purchases dental services from providers in bulk and sells them to group subscribers only. It does this through a series of provider and subscriber contracts, covered by what is known as its Penn Dental I program. Blue Shield also markets an indemnity dental program known as Penn Dental V. Dentists who choose to participate with Blue Shield enter into provider contracts that obligate them to accept a set fee from Blue Shield as their sole payment for providing services to Blue Shield subscribers. The reimbursement system establishing that set fee is based on the "usual, customary, and reasonable" (UCR) fees charged by Pennsylvania dentists for specific dental procedures.

Blue Shield enters into subscriber contracts with patients that provide that if covered services are obtained from a participating dentist, the subscriber will not be required to pay any additional or out-of-pocket amounts. Payment is made directly to the participating dentists by Blue Shield because participating dentists have agreed to accept the UCR fee for their services.

The subscriber contracts also cover dental services performed by dentists who do not participate in the Blue Shield program (non-participating dentists). But Blue Shield subscribers are not assured of paid-in-full service benefits if they obtain services from non-participating dentists. Blue Shield will pay only the predetermined UCR fee. Moreover, payment for non-participating dental services is made directly to the subscriber and not to the dentist.

Thus, generally speaking, the essential difference between participating dentists and non-participating dentists in the Blue Shield program is twofold: where the dentist participates, he is paid directly by Blue Shield and he agrees to accept the UCR fee as payment in full for services rendered a subscriber. Dentists who do not participate do not agree to be bound by the UCR fee; subscribers are personally responsible for any amount charged by such dentists in excess of this fee; moreover, the Blue Shield reimbursement is paid directly to the subscriber and not to the dentist.[3]

The thrust of appellants' price fixing complaint focuses primarily on Blue Shield's method of determining the UCR fee. It therefore becomes necessary to discuss first the relationship of participating dentists to the Blue Shield structure and second the mechanics of determining the UCR charge.

### A.

Blue Shield's by-laws provide that its business shall be managed by a board of directors and that lay persons shall constitute one-half of the board. That provision is in accordance with 40 Pa.Cons.Stat.Ann. § 6328(b)(1), which requires that at least 50% of Blue Shield's board consist of lay persons. The board consists of 32 members, 16 lay persons and 16 doctors. Only two members of the board are dentists.

Standing committees of various composition exist within the Blue Shield corporate structure to consider matters referred to them by the board or management of Blue Shield. Committee members are appointed by the chairman of the board. Two of these committees, of which dentists constitute a majority, command our interest.

The Dental Policy Committee (now known as the Dental Affairs Committee) considers matters referred to it by the board or by management and forwards its recommendations to the board for approval. The specific functions and responsibilities of the policy committee include: (1) examination and determination of the valid-

---

**3.** Other differences between participating and non-participating dentists include Blue Shield's refusal to grant non-participating dentists "excepted" dentist status, thereby requiring them to get pre-approval for new, expensive treatment, and its refusal to allow non-participating dentists to use the simpler claim forms used by participating dentists.

ity of new dental procedures; (2) review and reappraisal of current payment policies; (3) development of guidelines for maintaining a UCR mechanism; (4) development of guidelines for establishing fee schedule allowances; (5) provision of guidance to enhance provider participation; (6) review and reappraisal of the *Regulations for Participating Doctors;* and (7) review and appraisal of new health delivery systems. Many of these matters may reasonably be considered only by dental practitioners. Although the Blue Shield staff selects the majority of items on the committee's agenda, items are placed on it pursuant to requests from non-participating dentists as well as the public.

The Dental Review Committee is responsible for reviewing and making recommendations on matters affecting the status of dentists who participate in the Blue Shield program. These matters relate to conduct incompatible with participating dentist status, such as failing to verify charges with Blue Shield. The committee also considers disputes between Blue Shield and dentists involving questions of professional ethics. The composition of the review committee is established pursuant to Blue Shield's by-laws in accordance with state statute, 40 Pa.Cons.Stat.Ann. § 6324(c).

### B.

The parties do not dispute the mechanics of determining UCR charges. Under this system, when Blue Shield receives a bill with a dentist's fee, or charge, for a covered service, Blue Shield does not automatically allow payment of the full charge. Rather, the "allowance" may be different from the dentist's fee because of the operation of the three separate "screens" or artificial calculations—usual, customary, and reasonable.

The "usual charge" screen looks at the fees that an individual dentist most frequently charges patients for the procedure performed (*e.g.,* a particular type of filling or crown) during a specific time period in the past (base period). These usual charges (sometimes referred to as a den-

tist's profile) range from low to high, and the "usual charge" screen will set the maximum allowance at a specific percentile of the past charges. Since 1979, Blue Shield's usual charge screen has been the 75th percentile.

The "customary charge" for a particular procedure is measured as a function of all the "usual charges" of all dentists in Pennsylvania in the same speciality classification (of which there are five) during a designated base period. Since at least 1975, Blue Shield limits its allowance for any particular procedure to the 90th percentile of those charges. In recent years it has used the "usual charges" of the preceding calendar year as the base period.

The reasonable charge screen applies only in special circumstances, *e.g.,* when a dental procedure involves unique problems that require more time by the dentist. When special circumstances exist, Blue Shield might pay a larger percentage of the fee than would normally be allowed under the usual and customary charge screens. The extra allowance is determined by referring the claim to one of Blue Shield's dental advisors—a practicing dentist who works part-time for Blue Shield. The reasonable charge screen apparently is relevant to only a small percentage of claims; the usual and customary charge criteria come into play much more often.

### III.

It bears emphasis that the state initiated this action in 1981 by filing a complaint against the dental associations charging the associations with violating the antitrust laws by encouraging dentists to terminate their Blue Shield provider contracts. With the dispute of those particular parties behind us, and limited to a Rule 54(b) determination, we must now consider the reverse argument: whether Blue Shield has violated the federal antitrust laws.

Appellants first argue that Blue Shield engaged in a price-fixing conspiracy and an illegal group boycott in violation of § 1 of the Sherman Act. They then argue that Blue Shield monopolized and attempted to

monopolize certain Pennsylvania dental services markets in violation of § 2 of the Sherman Act. Finally, four of the individual dentist appellants argue that the district court erred in refusing to certify a subclass of cooperating dentists for treble damages purposes.

Our standard of review follows settled precepts. Because the district court rejected appellants' Sherman §§ 1 and 2 arguments on summary judgment, we must affirm if we determine that there are no disputed issues of material fact and that Blue Shield is entitled to judgment as a matter of law. *Coastal States Gas Corp. v. Department of Energy*, 644 F.2d 969, 978–79 (3d Cir.1981). Although summary judgment should be used sparingly in complex antitrust litigation, *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), its use is not forbidden, *see Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1071 (3d Cir.1978). As to the district court's refusal to certify the subclass, we must affirm in the absence of an abuse of discretion. *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 245 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

## IV.

As can be immediately perceived, appellants' arguments do not follow a narrow compass. They range far and wide through a thicket of antitrust law. We are required to discuss in one opinion such diverse concepts as horizontal and vertical price-fixing agreements, group boycotts, attempts to monopolize and actual monopoly in alternative markets, and, as a separate issue, the question of certifying a class action. All of this demands a discussion much more extensive and prolonged than that which we prefer to set forth in a typical decision of this court.

We turn first to appellants' restraint of trade arguments. Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To establish a violation of § 1, plaintiff must show evidence of concerted action that unreasonably restrains trade. *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). If an agreement is manifestly anticompetitive, it is conclusively presumed to be unreasonable and therefore deemed illegal *per se*. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Otherwise, the agreement must be analyzed under the rule of reason, which requires the factfinder to determine whether, under all the circumstances of the case, the restrictive practice imposes an unreasonable restraint on competition. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Essential to a finding of a § 1 violation is concerted action; unilateral action is not proscribed. *Monsanto Co. v. Spray-Rite Service Corp.*, — U.S. —, —, 104 S.Ct. 1464, 1468, 79 L.Ed.2d 775 (1984); *Malley-Duff & Associates, Inc. v. Crown Life Insurance Co.*, 734 F.2d 133, 141 (3d Cir.1984). Here, appellants argue that Blue Shield's conduct can be condemned as either illegal price-fixing or an illegal boycott, both *per se* violations of Sherman § 1.[4] We proceed to consider first appellants' price-fixing allegations and then their boycott claim.

4. Appellants appear to have abandoned the rule of reason in this appeal, contending instead that "The Rule of Reason Does Not Apply Here," "The District Court was wrong in applying the rule of reason at all," and "use of the rule of reason was error as a matter of law." Brief for appellants at 35, 40. Notwithstanding this express disclaimer of application of the rule of reason, appellants made further reference to the rule in their brief, arguing that the district court's rule of reason analysis, even if appropriate, was incorrect. *Id.* at 35–36, 40. Appellants discussion was so cursory, however, that this court is led to believe that appellants are not pursuing the rule of reason on appeal.

## V.

To determine whether Blue Shield has engaged in illegal price-fixing, we must decide whether Blue Shield may, consistent with the Sherman Act, establish a "usual, customary, and reasonable" reimbursement system and enter into bilateral provider agreements with individual dentists that obligate them to accept that reimbursement as payment in full for their services. Appellants contend that such an arrangement is illegal *per se* because Blue Shield did not act unilaterally in setting the reimbursement formula. They maintain that those dentists participating in the Blue Shield program and competing with them conspired and acted through Blue Shield, as their agent, to establish and implement the UCR system. This argument appears to be based on a theory of structural horizontal conspiracy with a vertical link. It is dependent upon proof that participating dentists, through their majority membership on the two Blue Shield committees, actually controlled the establishment of the UCR system implemented by Blue Shield.

Appellants also contend that the arrangement with Blue Shield is illegal *per se* because the dentists did not decide independently to participate. They argue that Blue Shield economically coerced them to enter into the provider agreements and accept the UCR reimbursement formula contained therein. This argument advances a theory of vertical restraint. It is dependent upon proof that the provider agreements themselves were the product of coercion or collaboration rather than merely bilateral contracts for the sale and purchase of services at a price unilaterally fixed by the purchaser and individually agreed to by the seller. Under either theory—structural horizontal conspiracy or vertical restraint—appellants argue that the UCR reimbursement formula, the subject of concerted action, is the type of pricing restraint condemned by the *per se* rule.

The Supreme Court has held that any combination formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se* under § 1 of the Sherman Act. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Pursuant to this rule, it has condemned horizontal agreements among competitors to fix prices, *see id.; Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (holding horizontal agreement among competitors to fix credit terms *per se* violation of § 1), as well as vertical resale price maintenance agreements, *see Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (holding distillers' agreement on maximum resale price of liquor sold by distributors *per se* violation of § 1) and *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (holding publisher's establishment of maximum resale price of newspapers sold by carriers *per se* violation of § 1). These decisions make clear that the *per se* rule applies to "an agreement to fix the price to be charged in transactions with third parties, not between the contracting parties themselves." *See Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978).

If we characterize the provider agreements at issue here as "merely arrangements for the purchase of goods and services by Blue Shield," *Group Health & Life Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 214, 99 S.Ct. 1067, 1075, 59 L.Ed.2d 261 (1979), Blue Shield can be viewed as a purchaser of dental services. As such, its establishment of the price it will pay the participating dentists with whom it contracts, as distinguished from the price it will charge third parties, is not price-fixing within the scope of the *per se* prohibition of § 1. *See Sitkin*, 575 F.2d at 446. Yet because Blue Shield is a purchaser that only partially reimburses the participating dentists for each sale of services, the participating dentists, in effect, are making one sale to a two-sided buyer composed of the insurer and the subscriber. It

is probably more accurate, therefore, to characterize Blue Shield as an indemnitor or third-party payor—the ultimate payor—rather than as a purchaser. Thus, we must proceed to analyze Blue Shield's conduct under the traditional notions of horizontal and vertical price-fixing.

## A.

Most recently, in *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), the Supreme Court found a medical insurance plan to be illegal *per se* as a horizontal price-fixing conspiracy. Defendants there were non-profit foundations composed of medical doctors. The member physicians, by majority vote, set maximum fees limiting the amount that they could recover as payment for services performed for patients insured under the approved insurance plans. These plans obtained foundation approval by agreeing to pay the doctors' charges up to a scheduled amount in return for the physicians' agreement to accept that amount as payment in full. The Court held that an agreement among competing physicians setting the maximum fees that may be claimed in full payment for health services provided to policyholders of specified insurance plans constitutes a *per se* violation of § 1. *Id.* at 335–36, 102 S.Ct. at 2469.

With respect to the case at bar and appellants' theory of horizontal conspiracy, however, there is no overt agreement among competing health care providers to establish or to fix prices as was the situation in *Maricopa*. That distinction, however, does not necessarily preclude a finding of a horizontal price-fixing agreement.

To the extent that Blue Shield's establishment of the UCR reimbursement system might disguise or embody an agreement among competing providers, its actions would come within the purview of § 1. *See United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, 624 F.2d 476 (4th Cir.1980); *see also Maricopa*, 457 U.S. at 352 n. 26, 102 S.Ct. at 2477 n. 26 (reserving question of whether insurer, who may be under control of providers, can lawfully fix the fee schedule and enter into bilateral contracts with individual providers).

Several recent cases have dealt with a concept that seeks to prove a horizontal agreement by a theory of structural conspiracy. In *Virginia Academy*, the Fourth Circuit found that Blue Shield plans were combinations of physicians operating under the direction and control of their physician members. 624 F.2d at 481. In that case, the plans' by-laws required that a majority of the board of directors be physicians, and there was evidence in Blue Shield documents and statements tending to show physician control. In *Human Resource Institute of Norfolk, Inc. v. Blue Cross of Virginia*, 498 F.Supp. 63, 66 (E.D.Va.1980), the court applied the "walking conspiracy" theory of *Virginia Academy* and found no provider control of Blue Cross, noting that Blue Cross's enabling statute required that a majority of a plan's board of directors be subscribers; that the board in fact had a subscriber majority, and that there was no direct evidence of member control of Blue Cross.[5]

---

5. Appellants argue that the decisions in *Glen Eden Hospital, Inc. v. Blue Cross & Blue Shield of Michigan*, 746 F.2d 423 (6th Cir.1984), and *Ratino v. Medical Service of the District of Columbia (Blue Shield )*, 718 F.2d 1260 (4th Cir.1983), which applied the "walking conspiracy" theory of *Virginia Academy,* militate in favor of finding provider control in the case at bar. We find both cases distinguishable. The Sixth Circuit in *Glen Eden* reversed the district court's conclusion that there was no provider control of Blue Cross. In *Glen Eden,* however, appellant-hospital was allowed only severely limited discovery

and its requests for information directly related to the theory that participating hospitals either controlled or greatly influenced the reimbursement policy of Blue Cross were denied. For this reason, the *Glen Eden* court concluded that the grant of summary judgment was premature. In the case before us, unlike *Glen Eden,* the parties have completed extensive discovery.

In *Ratino,* the Fourth Circuit reversed a summary judgment in favor of Blue Shield. There, the district court had concluded that the UCR plan fell within the McCarran-Ferguson Act's

We reject appellants' theory of structural horizontal conspiracy because the uncontroverted facts furnish no support for it. There is no genuine issue of material fact concerning Blue Shield's corporate and operational structure. The board of directors has the ultimate responsibility for Blue Shield's business decisions and only two members of its 32-member board are dentists. Health care providers do not constitute a majority on the board. The district court found that "[o]nly one-sixteenth of the persons responsible for making the decisions which [appellants] claim[ ] to be potentially and in fact anti-competitive are themselves competitors in the relevant market." Mem.op. at 15, *reprinted in* app. at 3386.

Appellants' structural conspiracy argument seems to ignore the construction of Blue Shield's board and focuses instead on the functions and composition of the review and policy committees. These facts are essentially not disputed. Admittedly, dentists constitute a majority on each of these committees. But majority membership on a committee, without more, does not make out a prima facie case of structural horizontal conspiracy. The power and the authority of that committee must be analyzed. As did the district court, we conclude that these committees were advisory only, that they were constituted and utilized as a resource to the board, that they participated in no activities anathematic to antitrust precepts, and rendered advice only when particularly solicited by the board. Appellants appear to concede that the policy committee does not approve policies for the board, but merely makes recommendations to it. We are not impressed by appellants' specific contentions in this respect, including its emphasis on the statement of one Blue Shield official that he could not remember any occasion when the policy committee's recommendation was not accepted by the board. Appellants argue that the committee developed,

voted on, and specifically approved Blue Shield's system for calculating the customary charge screen, as well as the switch to the 10% differential (or 90% performance level) and the use of statewide classes for calculating the customary charge. But it is not controverted that the use of statewide charge classes and the goal of seeking to allow at least 90% of aggregate charges were concepts developed and urged by management. Approval of these concepts by the policy committee was simply an approval of a management decision. Nor do appellants deny that the policy committee simply followed the recommendation of another committee in suggesting the allowance of the percentage of aggregate charges reported to the dental program. Action taken to find a market price so that a purchaser-insurer does not overpay does not constitute price-fixing.

Nor do we accept the notion that the review committee participated in price-fixing when it refused to update profiles of dentists who refused to verify their usual charges pursuant to Blue Shield procedures that called for "in-office reviews" of charges. The following factors strongly militate against appellants' argument: Blue Shield's requirement that dentists certify that their fees submitted to Blue Shield have not been inflated because of insurance coverage is consistent with the ethical rules of the dental profession, Blue Shield's in-office review experience showed that about one-half of the dentists who agreed to verify their usual charges had charged inflated fees to Blue Shield and that about one-third of the dentists contacted refused to verify their usual charges, the state health department has approved the concept of Blue Shield conducting in-office reviews to verify dentists' usual charges, and profile updates were not withheld until the board of directors authorized such action.

Distilled to its essence, the question comes to this. Blue Shield, as a purchaser

"business of insurance" exemption, *see* 15 U.S.C. §§ 1011–1015, thereby shielding the plan from antitrust scrutiny. Holding the McCarran-Ferguson Act inapplicable, the *Ratino* court re-

manded the case for fact findings and a determination as to whether Blue Shield's challenged practices constitute a price-fixing conspiracy or an illegal boycott.

of or ultimate payor for dental services, sought advice on the design and operation of its dental program from committees composed primarily of practicing dentists. To give advice when asked by the decisionmaker is not equivalent to being the decisionmaker itself. We see no dispute of material fact on this issue and we conclude that there was no support for appellants' structural horizontal conspiracy argument.[6]

### B.

■ Once appellants' horizontal theory of concerted action is eliminated, they are left with trying to prove that the provider agreements themselves evidence an unlawful vertical restraint. The Supreme Court has not condemned vertical price-fixing outside of the resale price maintenance context. *See Albrecht v. Herald Co.*, 390 U.S. 145, 151, 88 S.Ct. 869, 872, 19 L.Ed.2d 998 (1968) (*resale* price fixing is a *per se* violation); *Kiefer-Stewart Co. v. Joseph Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). As the Blue Shield provider agreements here differ greatly from the vertical arrangements to restrict resale prices invalidated in *Albrecht* and *Kiefer-Stewart*, we should be hesitant to condemn them under a *per se* rule. *See United States v. Topco Associates, Inc.*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133–1134, 31 L.Ed.2d 515 (1972) ("[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act"); *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.*, 675 F.2d 502, 505 (2d Cir.1982) (holding similar provider-insurer agreements valid under *per se* rule of vertical price-fixing). Moreover, if we were to extend *Albrecht* and *Kiefer-Stewart* to the facts in this case, there would have to be evidence of some collaboration or coercion

to find an unlawful price-fixing agreement. Appellants cannot prove that Blue Shield collaborated with the participating dentists unless it can prevail in its claim that the dentists really control Blue Shield. As we have already shown, this claim fails.

■ Appellants also advance an economic coercion conspiracy theory, arguing that Blue Shield's UCR system and administrative practices pressure dentists economically to participate. Undisputed facts give no support to this theory as a matter of law. First, Blue Shield also pays for services rendered by non-participating dentists and determines its payment allowance for services uniformly—regardless of participation status. Moreover, its dental plan covers no more than 35% of the privately insured population and purchases less than 9% of the dental care in Pennsylvania. We conclude that there is no basis for an inference that dentists are coerced to participate with Blue Shield.

### VI.

We turn now to appellants' contention that Blue Shield's UCR reimbursement system and related administrative practices, as well as its Dental Plus program, constitute an illegal boycott of non-participating dentists under § 1 of the Sherman Act. Dental Plus is a Blue Shield health maintenance organization program available to U.S. Steel employees at a certain plant that involves only participating dentists. Those dentists agree to provide all covered services to certain employee subscribers in return for a fixed fee per subscriber per month.

■ To establish proof of an illegal boycott under § 1, a plaintiff must show "concerted action with 'a purpose either to exclude a person or group from the mar-

---

**6.** Appellants argue that *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), is controlling. We disagree. In *Hydrolevel*, the Supreme Court held that standard-setting organizations may be liable under the antitrust laws for the actions of their agents committed with apparent authority. In that case, committee members had conspired to restrain trade unreasonably through a misinterpretation of the Boiler and Pressure Vessel Code. As we have concluded here, however, neither the policy nor review committees have engaged in conduct that runs afoul of the antitrust laws. Hence, there is no illegal conduct that may be imputed to Blue Shield.

ket, or to accomplish some other anti-competitive objective, or both.'" *Malley-Duff & Associates, Inc. v. Crown Life Insurance Co.*, 734 F.2d 133, 140 (3d Cir.1984) (quoting *DeFilippo v. Ford Motor Co.*, 516 F.2d 1313, 1318 (3d Cir.), *cert. denied*, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975)). In the context of addressing appellants' *per se* price-fixing contention, we have already demonstrated that Blue Shield's actions in setting the UCR reimbursement fee and entering into the provider agreements were purely unilateral. Accordingly, the concerted action necessary for Blue Shield to succeed with its primary boycott claim is missing, and that claim must fail.

■ Appellants' Dental Plus claim must also fail for lack of concerted action because there is no evidence that Blue Shield conspired with any dentists to establish Dental Plus criteria that would exclude non-participating dentists. *See Klamath-Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau*, 701 F.2d 1276, 1291 (9th Cir.) ("[s]ome evidence of concerted activity directed at the alleged victims of the boycott must be offered for the case to survive summary judgment"), *cert. denied*, —— U.S. ——, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983). Thus, as with their price-fixing claims, appellants' boycott claims fail to establish a *per se* violation under § 1. We now turn to the monopolization claims asserted under § 2 of the Sherman Act.

### VII.

■ Appellants argue that Blue Shield violated § 2 of the Sherman Act by attempting to monopolize and monopolizing the Pennsylvania market for the sale of prepaid dental care programs to group purchasers (Market I) and the Pennsylvania market for the quantity purchase of dental services (Market II).

Section 2 of the Sherman Act provides in pertinent part:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony ....

15 U.S.C. § 2. To establish the offense of monopolization under § 2, plaintiff must show: (1) the possession of monopoly power in the relevant geographic and product markets; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966). The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks, *id.* at 575–76, 86 S.Ct. at 1706; boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand, *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978); *see also Larry V. Muko, Inc. v. Southwestern Pennsylvania Building & Construction Trades Council*, 670 F.2d 421, 434 (3d Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 182 (1982). Monopoly power is generally defined as the power to control prices or to exclude competition, *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), and the size of market share is a primary determinant of whether monopoly power exists, *United States v. Aluminum Co. of America (Alcoa)*, 148 F.2d 416 (2d Cir.1945).

■ To establish the offense of an attempt to monopolize under § 2, plaintiff must show: (1) a specific intent to monopolize; and (2) the consequent dangerous probability of success within the relevant geographic and product markets. *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Swift & Co. v. United States*, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905). In proving specific intent, a mere intention to prevail over rivals or improve market position is insufficient. Even an intent to perform

acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts were not "predominantly motivated by legitimate business aims." *Times Picayune Publishing Co. v. United States*, 345 U.S. 594, 627, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). Direct evidence of specific intent need not be shown; it may be inferred from predatory or exclusionary conduct. *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545, 567 (E.D.Pa.1960), *aff'd*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

### A.

The parties agree to define Market I as the market for the statewide sale of prepaid dental services in which Blue Shield competes with a commercial insurer, Delta Dental, and other insurers. They further agree that Blue Shield's share of this market is 32–35%. The district court concluded that Blue Shield's market share was insufficient as a matter of law to establish monopolization of Market I, a conclusion appellants seem not to contest on appeal. We determine that this is entirely consistent with case law. *See Alcoa*, 148 F.2d at 424; *see also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir.1975). In addition, appellants' claim that Blue Shield attempted to monopolize Market I must fail as there is no evidence of specific intent. They point to the alleged § 1 violations of price-fixing and boycott as proof of this intent, but we have already rejected those

claims. Absent evidence of specific intent, we need not reach the question of whether Blue Shield's market share constitutes a "dangerous probability of success."

### B.

The parties disagree over the definition of Market II. Appellants define Market II as the statewide market for the purchase of dental services in bulk pursuant to participating dentist agreements in which Blue Shield and Delta Dental are the only purchasers. They argue that in this market Blue Shield has a 91% market share. Blue Shield would define the statewide market more broadly. It contends that this market should include all purchasers of dental services in bulk, and not only Blue Shield and Delta Dental. Affidavits of chief executive officers of Blue Shield's competitors for dental insurance business and affidavits of 12 persons who arrange for the purchases of dental insurance plans for Pennsylvania businesses and companies support Blue Shield's contention that from the perspective of purchasers of dental care coverage, Blue Shield, Delta Dental, other health services corporations, and commercial carriers are all in direct competition with each other. The district court noted that appellants "present[ed] no conflicting evidence to establish a material fact in dispute." Mem. op. at 31, *reprinted in* app. at 3402. But for their part, appellants relied solely on an affidavit by Dr. Comanor, an economist, for their definition of Market II—an affidavit that expressed an opinion based on factual assumptions for which appellants cited no support in the record and that was discredited by the district court.[7]

---

**7.** The district court commented:

The Comanor affidavit refers to many factual assumptions for which plaintiffs have cited no support in the record: "In the approximately 13 years that prepaid dental care and dental insurance have existed in Pennsylvania, it has become apparent that the commercial insurers are unwilling to supply programs which involve direct provider contact." (No basis for these statements and conclusions is cited.) "Moreover, while Blue Shield offers a dental indemnity program (Penndental V), this product appears to have been relatively

unsuccessful in Market I." (The plaintiffs have cited no evidence to permit the characterization of an objective on the part of Penndental V to compete in plaintiffs' Market I and a lack of success in that objective.) "On this basis, there appear to be factors which limit in Market I the degree of substitutability in production between prepaid service benefit dental programs and dental insurance or indemnity programs." (The language, "on this basis, there appears to be factors ..." is an inadequate foundation for the conclusion which follows.) "... [V]arious large employ-

To put Dr. Comanor's affidavit in proper perspective, reference must be made to expert testimony and especially to Rule 703, F.R.Evid., which provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

In *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666 (D.C.Cir.1977), the court, speaking through Judge J. Skelly Wright, emphasized that the factual predicate of an expert's opinion must find some support in the record. We agree with that court's decision and its reasoning:

To hold that Rule 703 prevents a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than ... theoretical speculations would seriously undermine the policies of Rule 56. We are unwilling to impose the fruitless expenses of litigation that would result

from such a limitation on the power of a court to grant summary judgment.

569 F.2d at 673. We therefore agree with the district court's determination of this issue in two important respects: the Comanor affidavit did not raise an issue of material fact and, in discrediting this affidavit for lack of critical factual support, the court did not err in accepting the factual averments in Blue Shield's submissions that defined the boundaries of Market II. We also agree with the district court and conclude that appellants' monopoly argument, which hinged on their definition of Market II, must fail. Moreover, their argument that there was an attempt to monopolize must fail on the same grounds that it failed vis-a-vis Market I.

### VIII.

This brings us to the summary judgment entered in behalf of Blue Shield on the class action claim asserted by the individual dentists. According to Rule 23(a), F.R. Civ.P., a class member cannot serve as a representative party on behalf of the entire class unless, *inter alia,* he or she will "fairly and adequately protect the interests of the class." Adequate representation de-

---

ers, as well as governmental bodies and unions themselves, desire only prepaid service benefit dental programs." (No factual basis for this statement is cited.) "For these groups, who are on the buying side of Market I, the degree of substitutability in use between prepaid service benefit dental programs and dental indemnity programs may be quite low." (This statement on its face is surmise.) "Fluctuations in price will not cause them to switch from a prepaid service benefit dental program to a dental indemnity program to the extent that they are committed, whether because of union pressures or some other reason, to provide fully prepaid dental care." (There is no factual basis cited for this statement. Further, it is a conditional statement and can not on its face support the conclusion that follows.) "For other purchasers, however, the degree of substitutability in use between prepaid service benefit dental programs and dental indemnity programs may be relatively high." (This statement on its face is surmise.) "In conclusion, the cross-elasticities of supply and demand in Market I suggest that it can be viewed as a market with two distinct sub-markets." (Considering the lack of a factual basis for the propositions leading

to this conclusion and the tentative nature of this statement, the conclusion is not established for purposes of this motion.)

In establishing the existence of two markets of purchasers of dental services in Pennsylvania, Dr. Comanor views the relevant issue as "whether, in response to any possible price cuts by Blue Shield or Delta Dental, dentists will shift their output from the production of pre-paid dental care to individual dental care." If so, Dr. Comanor says, these two markets would effectively be one, but if not, there are really two separate and distinct markets. Dr. Comanor then concludes that whether "dentists will shift" depends upon whether dentists are at full capacity. If the dentist is not at full capacity, Dr. Comanor says, he is not likely to shift in response to price differences and there are therefore two markets. Dr. Comanor states that, "The fact that substantial excess capacity exists among Pennsylvania dentists suggests the finding of separate markets." The plaintiffs have cited no facts supporting the proposition that substantial excess capacity exists among Pennsylvania dentists.

Mem. op. at 28–30, *reprinted in* app. at 3399–401.

pends on two factors: (1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation; and (2) the plaintiff must not have interests antagonistic to those of the class. *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562 (2d Cir.1968). Where the district court appropriately applies the criteria of Rule 23(a), it has broad discretion in determining whether the action may be maintained as a class action, and it is subject to reversal only for an abuse of that discretion. *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 757 (3d Cir.) (in banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974).

 In their class action counterclaim against Blue Shield, the individual dentists alleged two distinct subclasses of dentists: (1) a subclass of cooperating dentists, consisting of participating and non-participating dentists, who accept Blue Shield's allowances as full payment for their services; and (2) a subclass of non-cooperating dentists, all non-participating dentists, who bill Blue Shield subscribers for the balance between their current fees and Blue Shield's allowances. Of the four class plaintiffs, three are non-cooperating dentists and one, Dr. King, is a cooperating one. The subclass of cooperating dentists seeks damages in the amount of the difference between Blue Shield's allowances to them and the competitive price for their services. The district court refused to certify the subclass of cooperating dentists because (1) there are inherent conflicts between the participating and non-participating dentists, and (2) as a non-participating dentist, Dr. King cannot fairly and adequately represent the participating members of the subclass. The district court properly applied Rule 23(a) to the undisputed facts of the case and determined that Dr. King's interests, as a non-participating dentist, were antagonistic to those of participating dentists who were also part of the subclass of cooperating dentists. We cannot say that the district court abused its discretion in finding him to be an inadequate class representative and refusing to certify the subclass on that basis.

IX.

We have considered the many contentions raised by appellants. We have concluded that the district court did not err as a matter of law or impermissibly resolve any disputed issue of fact in determining that Blue Shield did not engage in an illegal price-fixing conspiracy or boycott in violation of § 1 of the Sherman Act, in determining that Blue Shield did not attempt to monopolize or monopolize in violation of § 2 of the Sherman Act, and that the district court did not abuse its discretion in refusing to certify a subclass of cooperating dentists for treble damages purposes.

The judgment of the district court will be affirmed in all respects.