**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 15-2032

———————

DEBORAH HEART & LUNG CENTER,

Appellant

v.

VIRTUA HEALTH, INC.;
VIRTUA MEMORIAL HOSPITAL BURLINGTON
COUNTY;
THE CARDIOLOGY GROUP, P.A.; JOHN DOES 1-10

———————

On Appeal from the United States District Court
for the District of New Jersey
(D. C. Civil No. 1-11-cv-01290)
District Judge:  Honorable Renee M. Bumb

———————

Argued on February 10, 2016

Before:  FUENTES, KRAUSE and ROTH, Circuit Judges

(Opinion filed:  August 17, 2016)

Anthony Argiropoulos, Esquire    (**Argued**)
Thomas Kane, Esquire
Epstein Becker & Green
One Gateway Center
13th Floor
Newark, NJ 07102

               Counsel for Appellant

James J. Ferrelli, Esquire
Duane Morris
1940 Route 70 East
Suite 100
Cherry Hill, NJ 08003

Seth A. Goldberg, Esquire
Philip H. Lebowitz, Esquire        (**Argued**)
Duane Morris
30 South 17th Street
United Plaza
Philadelphia, PA 19103

               Counsel for Appellees Virtua Health,
               Inc. and Virtua Memorial Hospital
               Burlington County

Robert V. Dell'Osa, Esquire
Cozen O'Connor
1650 Market Street
One Liberty Place, Suite 2800
Philadelphia, PA 19103

               Counsel for Appellee Cardiology Group

2

P.A.

---

O P I N I O N

---

**ROTH**, <u>Circuit Judge</u>:

In antitrust suits, definitions matter. When a plaintiff offers an undisputed definition of the relevant products and markets at issue, it is just and reasonable to hold the plaintiff to its own definition. Deborah Heart and Lung Center (Deborah) set the parameters for the instant dispute before the District Court and subsequently failed to meet its own self-imposed burden. Consequently, we will affirm the District Court's entry of judgment in favor of Virtua Health, Inc. (Virtua), Virtua Memorial Hospital Burlington County (Virtua Memorial), and The Cardiology Group P.A. (CGPA).

**I.**

The record in this case is voluminous, and the District Court ably laid out the factual circumstances in its opinion.[1] Nevertheless, an abbreviated summary is useful here to provide clarity and background. Deborah is a charity hospital located in Browns Mills, New Jersey. Virtua operates multiple hospitals in southern New Jersey, including Virtua Memorial. CGPA was a group of twelve cardiologists who practiced in Burlington County, New Jersey. Cardiac surgery could not be performed at Virtua Memorial during the time

---

[1] *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, No. 11-1290, 2015 WL 1321674, at *1–6 (D.N.J. Mar. 24, 2015).

period at issue, due to state regulations. Deborah and Virtua competed in the market for medical services.

Deborah identified the "products" over which the instant dispute arose as emergency and non-emergency advanced cardiac interventional procedures, referred to as ACIs. ACIs include angioplasties and other procedures to alleviate cardiac blockages. If a patient requires an ACI procedure and her doctor lacks the expertise or privileges at a suitable hospital, the patient must be referred to another physician or hospital that is authorized to provide the procedures. In New Jersey, the hospital in which the patient is being treated may be prevented by state regulation from allowing ACIs to be performed, which would also necessitate a transfer to an authorized cardiac hospital. For non-emergency ACI procedures, the market at issue, as defined by expert testimony submitted by Deborah, consists of five New Jersey counties and portions of Philadelphia. For emergency procedures, the market consists of three New Jersey counties. Virtua did not challenge Deborah's market definitions in the District Court, nor does it do so here.

Until July 2006, none of CGPA's physicians could perform ACI procedures. Consequently, CGPA had to refer its patients in need of ACIs to other doctors. Beginning in 1992, CGPA and Deborah had a relationship that resulted in the transfer of numerous ACI patients to Deborah. This relationship was formalized in 1999 through five individual contracts, known as physician leases, between ACI-qualified cardiologists at Deborah and CGPA.

The ties between CGPA and Deborah began to fray in 2005, when the doctors at CGPA entered into an exclusive

agreement to provide Virtua Memorial with all necessary cardiovascular services. Referrals to Deborah still occurred after the agreement was signed, but those referrals dropped off significantly, from 627 in 2005 to 60 in the first seven months of 2010. In 2006, CGPA hired a doctor—who had previously worked at Deborah—who was capable of performing some ACIs, leading CGPA to terminate its physician leases with Deborah.

In 2007, CGPA signed a new set of physician leases, this time with doctors who worked primarily at Penn Presbyterian Hospital in Philadelphia. Under the new agreement, when CGPA patients needed procedures that its physicians could not perform or that could not be performed at Virtua Memorial, those patients were typically transferred to Penn Presbyterian. Virtua is not mentioned in the new contracts, but Deborah alleges that Virtua was an unnamed party that participated in the contracts' negotiation. Deborah also alleges that the goal of the new physician leases was to drive Deborah out of business.

Prior to the 2007 contract with Penn Presbyterian, approximately eighty-five percent of CGPA's transfers went to Deborah. After the contract, only thirty percent of transfers went to Deborah while seventy percent went to Penn Presbyterian. Deborah asserts that this arrangement constituted an illegal restraint on trade and resulted in harm to competition because it forced some consumers to obtain ACI procedures at Penn Presbyterian when, in a competitive market, they would have chosen Deborah. Deborah also alleges that the quality of care at Deborah was superior to the quality offered at other facilities in the market.

Deborah's amended complaint, filed in the U.S. District Court for the District of New Jersey, asserted that CGPA and Virtua violated Section 1 and Section 2 of the Sherman Act.[2] Deborah also filed suit in New Jersey state court alleging common law claims for tortious interference and unfair competition. The District Court dismissed the Section 2 count from the amended complaint for failure to state a claim, a ruling from which Deborah does not appeal. Following lengthy discovery, the District Court in its well-reasoned opinion granted Virtua and CGPA's motions for summary judgment on Deborah's Section 1 claim, holding that Deborah did not introduce sufficient evidence to show injury to competition in the designated markets.

## II.[3]

Resolution of the instant appeal is relatively simple, but we write to clarify the burden on an antitrust plaintiff, alleging a Section 1 claim in which the plaintiff does not assert that the defendants possess market power. An antitrust plaintiff must prove four prongs: (1) "concerted action by the

[2] 15 U.S.C. §§ 1–2.

[3] The District Court had jurisdiction over this matter pursuant to 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337(a). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Our review of a District Court's grant of summary judgment is plenary. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). Summary judgment is appropriate if, after drawing all reasonable inferences in favor of the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014)).

6

defendants," (2) "anti-competitive effects within the relevant product and geographic markets," (3) that "the concerted actions were illegal" and (4) that the plaintiff "was injured as a proximate result of the concerted action."[4] Failure to prove any one of these prongs is fatal to the Section 1 claim.[5] The District Court held that Deborah failed to present sufficient evidence to raise a genuine issue of material fact as to the second prong of this inquiry.

Section 1 claims are evaluated, except in certain circumstances inapplicable here, under the "rule of reason."[6] Deborah alleges that CGPA and Virtua engaged in an illegal exclusive dealing arrangement with Penn Presbyterian, meaning that Deborah must prove that the arrangement's "'probable effect' is to substantially lessen competition in the relevant market."[7]

As previously mentioned, the definition of the relevant markets at issue was not disputed in the District Court.[8] The relevant market for emergency ACI procedures consisted of three New Jersey counties, while the relevant market for non-

---

[4] *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005).

[5] *Id.*

[6] *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 268 (3d Cir. 2012).

[7] *Id*.

[8] J.A. 15; *id.* at 734:10-14 (Summary Judgment Hearing Tr.: "The Court [to Deborah counsel]: You don't dispute the definition of the market, right? [Deborah counsel]: No. We submitted a report, it's not in dispute, so it is our definition of the market. We agree with that.").

7

emergency ACI procedures consisted of those three counties, plus two more New Jersey counties and parts of Philadelphia. Thus, to proceed to trial, Deborah must present sufficient evidence of anti-competitive effects "in the relevant market."[9] Anti-competitive effects for Section 1 purposes can be shown in two ways: by showing "actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods and services," or by showing the defendant has "[m]arket power—the ability to raise prices above those that would prevail in a competitive market," which is "essentially a surrogate for detrimental effects."[10] We have noted that "the difficulty of isolating the market effects of the challenged conduct" means proof of "actual anticompetitive effects," as opposed to market power, "is often impossible to make."[11]

Deborah did not, and, indeed, could not argue that CGPA and Virtua had sufficient market power as a stand-in for proof of actual anticompetitive effects.[12] Deborah's expert explained that the relevant market included multiple hospitals and hundreds of cardiologists. At most, CGPA's physicians represented less than eight percent of the cardiologists practicing in the relevant market for emergency

---

[9] *ZF Meritor, LLC*, 696 F.3d at 268.

[10] *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 276 (3d Cir. 1999) (quoting *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 (3d Cir. 1996)).

[11] *Id.*

[12] Deborah's attempts to raise a market power argument before us in the first instance are inappropriate, given that the failure to raise the argument before the District Court waived any opportunity to raise it here. *Metro. Edison Co. v. Pa. Pub. Utility Comm'n*, 767 F.3d 335, 352 (3d Cir. 2014).

ACI procedures and less than five percent of the cardiologists practicing in the relevant market for non-emergency ACI procedures.  Thus, Deborah attempted to show actual anti-competitive effects.  It did so, however, only in reference to a small subset of patients, namely, CGPA's patients and those patients who appeared in Virtua Memorial's emergency room.  Deborah argues that, to prevail, it need not show anti-competitive effects in the market as a whole, so long as it shows more than a *de minimis* effect on competition in the market.  Deborah's argument is foreclosed by our long-standing precedent.

In *Eichorn v. AT&T Corp.*, we held that, in a rule of reason analysis, courts must "examine the competitive significance of the alleged restraint to determine whether it has an anti-competitive effect on the market and is an unreasonable restraint on trade."[13]  In that case, we clarified that "the relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks."[14]  Deborah's expert stated that the "relevant geographic market" at issue in this matter are the three- and five-county areas in New Jersey and parts of Philadelphia previously mentioned.  Yet, all of the arguments on which Deborah relies to show anti-competitive effects pertain solely to CGPA's patients and patients entering Virtua Memorial's emergency room.

Such a narrow definition would be improper even if it

---

[13] 248 F.3d 131, 145 (3d Cir. 2001) (citing *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991)).
[14] *Id.* at 147 (quoting *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir. 1984)).

matched with Deborah's expert's evaluation of the market at issue, which it does not. In *Brader v. Allegheny General Hospital*, we noted that courts have routinely concluded that "absent an allegation that the hospital is the only one serving a particular area or offers a unique set of services . . . the relevant geographic market" may not be limited "to a single hospital."[15] There is no evidence in the record indicating that CGPA or Virtua Memorial were sufficiently unique to warrant reducing the size of the geographic market to only those entities, nor does Deborah make such an attempt here. Thus, assuming, *arguendo*, that Deborah presented sufficient evidence that CGPA and Virtua's agreement caused some anti-competitive effects to the patients of those entities, such a showing is insufficient to demonstrate the type of anti-competitive effects on the overall market necessary to prove a Section 1 claim.

The United States Supreme Court reached a similar conclusion in *Jefferson Parish Hospital District No. 2 v. Hyde*, in which the Court evaluated the "tying" of anesthesiology services to surgical services at a New Orleans hospital, requiring all patients at the hospital to use a single group of anesthesiologists.[16] Notably, the restraint in *Jefferson Parish* was even more severe than that present in the instant matter. Here, a significant minority of CGPA and Virtua patients were still treated at Deborah after the allegedly anti-competitive arrangement, while the *Jefferson Parish* patients were prohibited from being treated by anesthesiologists other than those contracted to the hospital in

---

[15] 64 F.3d 869, 877–78 (3d Cir. 1995) (collecting cases).
[16] 466 U.S. 2, 4–5 (1984).

10

question.[17]

The Supreme Court held that even though the hospital in that case required all of its patients to use a single anesthesiology provider, the hospital's actions did not violate the Sherman Act because Dr. Hyde, the plaintiff anesthesiologist who could not practice at East Jefferson Hospital, failed to show anti-competitive effects on "the market as a whole," specifically, the larger New Orleans metropolitan area with approximately twenty hospitals.[18] In *Jefferson Parish*, the plaintiff presented anecdotal evidence that patients were unable to obtain the anesthesiologist of their choice, attempting to show actual anti-competitive effects based on the restriction of consumer choice at the hospital in question.[19] The Supreme Court held that such evidence was not enough, observing that "[i]t may well be true that the contract made it necessary for Dr. Hyde and others to practice elsewhere, rather than at East Jefferson. But there has been no showing that the market as a whole has been affected at all by the contract."[20]

Despite Deborah's efforts to distinguish *Jefferson Parish*, there is no cognizable difference between the anti-competitive effects found insufficient there and the anti-competitive effects alleged here. Deborah makes much of the alleged fact that CGPA patients were *de facto* prevented from using the hospital of their choosing because patients did not learn of the arrangement between CGPA and Penn Presbyterian until it was too late, when the patients were

---

[17] *Id.*

[18] *Id.* at 7 n.7, 26–27; 31.

[19] *Id.* at 29–30.

[20] *Id.* at 31.

11

already being treated by CGPA physicians. The same, however, was true of the *Jefferson Parish* patients, where the Supreme Court noted that patients with a decided preference for one anesthesiology provider over another could, absent emergency situations, choose another hospital.[21] The Court held that the mere fact that consumers were required to make a choice to change hospitals in order to obtain the anesthesiologist of their choice did not constitute a Sherman Act violation.[22]

We conclude that a plaintiff, who asserts actual anti-competitive effects to prove a Section 1 violation, must, absent evidence of market power possessed by the defendants, show anti-competitive effects on the market as a whole. Where, as here, a plaintiff shows effects only on a small subset of that market and makes no attempt to show broader effects, the plaintiff cannot meet the requirements of the second prong of the antitrust inquiry. Deborah staked its ground for the instant dispute and its failure to occupy enough of that ground is fatal to its claims.

### III.

For the foregoing reasons, we will affirm the judgment of the District Court.

---

[21] *See id.* at 23–25.
[22] *Id.*